UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
UNITED STATES OF AMERICA and THE STATE
OF NEW YORK <u>ex rel.</u> VINCENT FORCIER,

                    Plaintiffs,

                                        12-CV-1750 (DAB)
        v.                              <u>MEMORANDUM AND ORDER</u>

COMPUTER SCIENCES CORP. and
THE CITY OF NEW YORK,

                    Defendants.
----------------------------------------X
DEBORAH A. BATTS, United States District Judge.

        In this <u>qui tam</u> action, Relator Vincent Forcier ("Relator")

alleges that Defendants the City of New York (the "City") and

Computer Sciences Corporation ("CSC")[1] violated the federal False

Claims Act ("FCA"), 31 U.S.C. §§ 3729 <u>et seq.</u>, and the New York

False Claims Act ("NY FCA"), N.Y. Finance Law §§ 187 <u>et seq.</u>, by

submitting false claims to Medicaid for reimbursement. The

United States (the "Government") and the State of New York (the

"State," and together with the Government, "Plaintiffs") have

both elected to intervene.

        The City and CSC have moved to dismiss the Government's

Complaint-in-Intervention (the "U.S. Compl."), New York's

Complaint-in-Intervention (the "N.Y. Compl."), and the Relator's

Second Amended Complaint ("SAC" or "Relator Complaint"). For the

---

[1] For an explanation of CSC's role, <u>see</u> <u>infra</u> Part I.B.1.

reasons that follow, the motions are DENIED in part and GRANTED in part.


I.   FACTUAL BACKGROUND

A. Statutory and Regulatory Framework

The Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. ("IDEA"), was enacted out of a need to, inter alia, "enhance the development of infants and toddlers with disabilities . . . [and] minimize their potential for developmental delay." Id. § 1431(a)(1). To that end, it provides federal funding to states "develop and implement a statewide . . . interagency system" to provide "early intervention services" for children under three years of age who are experiencing developmental delays or who have "a diagnosed physical or mental condition that has a high probability of resulting in developmental delay." Id. §§ 1431(b)(1), 1433(5)(A). Federal IDEA funding is available to states only to the extent that the costs of evaluation and care for eligible children are not paid for by other sources, including private insurance and Medicaid.[2] Id. § 1440.

---

[2] Federal law explicitly allows for Medicaid funds to be used to pay for services provided to Medicaid-eligible children prior to using IDEA funds. 42 U.S.C. § 1396b(c).

In accordance with the IDEA, New York State created the Early Intervention Program ("EIP") to provide services to eligible children and designated the Department of Health ("DOH") as the "[l]ead agency." N.Y. PUB. HEALTH L. § 2541(12). New York's EIP specifies the process by which children are evaluated for eligibility and an individualized family service plan ("IFSP") is developed for those children found to be eligible. Id. §§ 2544-45. The EIP provides for municipalities to pay service providers directly and assume responsibility for seeking reimbursement. (U.S. Compl. ¶¶ 27-28.) In that circumstance, "for the purpose of seeking payment from [Medicaid] or from other third party payors, the municipality shall be deemed the provider of such early intervention services to the extent that the provider has promptly furnished to the municipality adequate and complete information necessary to support the municipality billing." Id. § 2559(3)(a).[3]

During all times relevant here, the City assumed responsibility for paying service providers for EIP services rendered to eligible children pursuant to an IFSP within New York City[4] and seeking reimbursement from private insurance,

---

[3] This provision was amended effective March 30, 2012. See 2012 N.Y. Sess. Laws ch. 56 (McKinney).

[4] The City is treated as a municipality in the State's EIP framework. Id. § 2541(12) (defining municipality as "a county

Medicaid or the State's EIP program. (U.S. Compl. ¶ 48.) State
EIP regulations require municipalities, "in the first instance
and where applicable, [to] seek payment from private third party
insurers, prior to claiming payment from Medicaid or the
Department of Health, for services delivered to eligible
children and their families." 10 N.Y.C.R.R. § 69-4.22(a). Those
costs not covered by private insurance or Medicaid were shared
equally by the State and the City. N.Y. PUB. HEALTH L. § 2557(2)
("[DOH] shall reimburse the approved costs paid by a
municipality . . . , other than those reimbursable by [Medicaid]
or by third party payors, in an amount of fifty percent of the
amount expended.").

Medicaid is a federal program that provides medical care to
eligible individuals, including families with low incomes and
persons with certain disabilities, by reimbursing states for
health care provided under its auspices. 42 U.S.C. § 1396 et
seq. Subject to federal approval and review, states are
responsible for establishing and administering their own
Medicaid plans, abiding by federal guidelines and paying health
care providers for the services they render. State Medicaid
plans must in turn seek reimbursement for a portion of their

---

outside the city of New York or the city of New York in the case
of a county contained within the city of New York").

expenditures from the federal Centers for Medicare and Medicaid Services. (N.Y. Compl. ¶ 27.)

Central to the claims asserted by the Government and the State is what they term Medicaid's "secondary payor requirement." (See U.S. Compl. ¶¶ 35-42; N.Y. Compl. ¶¶ 29-37.) In general terms, the requirement means that "Medicaid [does] not pay claims for which third parties [a]re liable." (U.S. Compl. ¶ 36; see N.Y. Compl. ¶¶ 29-30.) Here, Plaintiffs allege that it "required the City and CSC to exhaust private insurance coverage before submitting claims to Medicaid." (U.S. Compl. ¶ 2.) Plaintiffs premise this on: (1) federal and state Medicaid regulations; (2) New York Medicaid manuals and DOH guidance; and (3) Medicaid Certifications that the City and CSC were required to execute on an annual basis.

Federal Medicaid regulations require that states "must take reasonable measures to determine the legal liability of the third parties who are liable to pay for services" furnished under each state's plan. 42 C.F.R. § 433.138(a); 42 U.S.C. § 1396a(25). New York Medicaid regulations, in turn, require providers "[a]s a condition of payment, . . . [to] take reasonable measures to ascertain the legal liability of third parties to pay for medical care and services." 18 N.Y.C.R.R. § 540.6(e)(1). The regulations further provide that "[n]o claim for reimbursement shall be submitted unless the provider has":

> (i) investigated to find third-party resources in the same
> manner and to the same extent as the provider would to
> ascertain the existence of third-party resources for
> individuals for whom reimbursement is not available under
> the medical assistance program; and
> (ii) sought reimbursement from liable third parties.

Id. § 540.6(e)(2). Although providers are required to submit claims to the state Medicaid plan within 90 days of the care being provided, there is an exception to that rule for "circumstances outside of the control of the provider," including "attempts to recover from a third party insurer." Id. § 540.6(a)(1).

New York regulations further specify steps that Medicaid providers are required to take. Providers are required to: request from the patient "any resources available to pay for medical care and services," id. § 540.6(e)(3)(i); "investigate the possibility of making a claim" to any potentially liable third party and make any "reasonably appropriate" claims, id. § 540.6(e)(3)(iv); continue to investigate sources of third-party reimbursement after submitting a claim to Medicaid "to at least the same extent that such investigations . . . would occur in the absence of reimbursement" by Medicaid, id. § 540.6(e)(3)(iii); and, "take any other reasonable measures necessary to assure that no claims are submitted to [Medicaid] that could be submitted to another source of reimbursement," id. § 540.6(e)(3)(v).

6

The Government additionally alleges that New York Medicaid provided guidance that emphasized the secondary payor requirement. First, New York Medicaid's Provider Manual for General Policy stated that Medicaid will pay for care "only after all [private insurance] resources available for payments have been exhausted," and that private insurance payments "must be received" before submitting a claim to Medicaid. (U.S. Compl. ¶ 40.) Further, New York Medicaid's Provider Manual for Third Party Information advised participants that private insurance "must be utilized for payment . . . prior to submitting claims to the Medicaid Program." (Id.) The Government also alleges that, in 2003, DOH "issued guidance directed to municipal EIP officials" instructing that, in the event of a "technical error" like an "incorrect policy number" in a claim submitted to private insurance, municipal officials were required to correct the error and resubmit the claim to private insurance before submitting the claim to Medicaid. (Id.)

Finally, Plaintiffs rely on the annual Medicaid Certifications executed by the City and CSC. New York requires any person or entity seeking to submit claims for reimbursement to the state Medicaid plan to enroll as a provider. 18 N.Y.C.R.R. § 504.1(a)(1); see id. § 504.9 (requiring billing services to enroll as Medicaid providers). Enrolled providers are required, prior to submitting claims and annually in order

7

to remain enrolled as a provider, to execute a Certification Statement ("Medicaid Certification"). (U.S. Compl. ¶ 43; N.Y. Compl. ¶¶ 43-52; <u>see</u> U.S. Compl. Ex. A (2009 City Medicaid Certification); <u>id.</u> Ex. B (2010 CSC Medicaid Certification).) The Medicaid Certification states, <u>inter alia</u>:

- "[N]o part of [any claim] has been paid by, or to the best of my knowledge is payable from any other source other than [Medicaid]."
- "ALL STATEMENTS, DATA AND INFORMATION TRANSMITTED ARE TRUE, ACCURATE AND COMPLETE TO THE BEST OF MY KNOWLEDGE; NO MAERIAL FACT HAS BEEN OMITTED; I UNDERSTAND THAT PAYMENT AND SATISFACTION OF THIS CLAIM WILL BE FROM FEDERAL, STATE AND LOCAL PUBLIC FUNDS AND THAT I MAY BE FINED AND/OR PROSECUTED UNDER APPLICABLE FEDERAL AND STATE LAWS FOR ANY VIOLATION OF THE TERMS OF THIS CERTIFICATION, INCLUDING BUT NOT LIMITED TO FALSE CLAIMS, STATEMENTS OR DOCUMENTS, OR CONCEALMENT OF A MATERIAL FACT[.]"
- "In submitting claims under this agreement I understand that . . . the entity . . . shall be subject to and bound by all rules, regulations, policies, standards, fee codes and procedures of the [DOH] . . . as set forth in statute or title 18 of the [N.Y.C.R.R.] and other publications of the [DOH], including eMedNY Provider Manuals and other official bulletins of the [DOH]."

(<u>Id.</u> Ex. A.)


B. Allegations in the Complaint

Plaintiffs' claims center on the Defendants' allegedly fraudulent efforts to secure reimbursement from Medicaid for the cost of care provided to Medicaid-eligible EIP participants without adequately submitting claims to private insurers prior

8

to absorbing the City's share of those costs pursuant to the terms of the EIP program. In order to maximize Medicaid reimbursements, Plaintiffs allege that the City and CSC submitted claims to private insurers with a placeholder (999-999-999) in the policy number field knowing that the claim would be denied, and subsequently submitted those claims directly to Medicaid for reimbursement before private insurers paid their share. In a separate scheme, Plaintiffs allege that Defendants failed to respond to inquiries from private insurers to which it had submitted other claims, preventing payment by those insurers, and then waited 90 or 120 days to create a "dummy" record that each such claim had been denied and submitting the claim to Medicaid with a code (0Fill) that falsely indicated that private insurance had denied coverage. The Government additionally alleges that the City and CSC fraudulently "defaulted" erroneous or missing diagnosis codes to a generic code knowing that Medicaid would accept the code and pay the claim. Finally, the State alleges that CSC failed to return overpayments to Medicaid in a timely manner. Each alleged scheme is described in greater detail below.

1. CSC's Contract with the City

Following a bidding process, the City entered into a contract with CSC to act as its fiscal agent beginning in August

9

2008. (U.S. Compl. ¶ 49; N.Y. Compl. ¶ 54.) Both the City and CSC were enrolled as providers in the Medicaid system and submitted Medicaid Certifications on an annual basis. (U.S. Compl. ¶ 43-44; N.Y. Compl. ¶¶ 43-45, 26.) Pursuant to the contract, CSC was responsible for processing and paying claims for payment from EIP service providers; submitting those claims to private insurers, Medicaid and the state for reimbursement; and implementing certain data collection and record-keeping systems. (U.S. Compl. ¶ 50; N.Y. Compl. ¶ 55.)

Plaintiffs allege that the City, having paid EIP service providers up front, had a clear incentive to maximize its reimbursements from third-party payers and Medicaid. Medicaid typically reimbursed the City for the full cost of care provided to Medicaid-eligible patients, whereas EIP care not covered by Medicaid (or another third party) would be split about equally between the City and the State. (U.S. Compl. ¶ 55; N.Y. ¶ Compl. 60.) Plaintiffs also allege that Medicaid was less likely than a private insurer to request additional information about a particular claim, resulting in more prompt payments and reduced administrative costs. (U.S. Compl. ¶ 57; N.Y. Compl. ¶¶ 60-61.)

According to Plaintiffs, the City created a similar incentive for CSC through two contractual provisions. First, the City set annual targets for the level of Medicaid reimbursements that CSC was expected to obtain, both in dollar terms and as a

percentage of DOH's overall EIP expenditures. (U.S. Compl. ¶ 58; N.Y. Compl. ¶¶ 60-61.) If CSC failed to achieve the level specified by the City, there was a "liquidated damages" provision in the contract that allowed the City to withhold a penalty from the fees CSC would otherwise have been entitled to. (U.S. Compl. ¶ 60.) In 2010, when CSC failed to meet the City's goals, the City withheld $100,000 from CSC's compensation as a penalty. (Id.; N.Y. Compl. ¶ 62.) Second, the contract between the City and CSC also provided for "performance based compensation": CSC would earn "incentive payments" of 15% of any Medicaid reimbursements beyond a certain dollar threshold. (U.S. Compl. ¶ 59; N.Y. Compl. ¶ 63.)

Plaintiffs allege that this contractual arrangement was in violation of both federal and state law. Specifically, federal and state regulations allow Medicaid providers to employ a billing agent, provided the agent's compensation is not tied to the amount of money that is billed or collected or otherwise dependent on the collection of payment. 42 C.F.R. § 447.10; 18 N.Y.C.R.R. § 360-7.5(c). The Government further alleges that the City and CSC were aware of these concerns at the time they entered into the contract described above. (U.S. Compl. ¶¶ 120-21.)

### 2. 999-999-999 Claims

The Government alleges that "in 2010, the City expressed dismay at CSC's failure to obtain reimbursement from Medicaid" with the frequency and speed it required. (U.S. Compl. ¶ 67.) By May of 2010, CSC and the City realized that their database did not have accurate or complete policy numbers for private insurance carried by many children who received EIP services. (U.S. Compl. ¶ 69; N.Y. Compl. ¶ 88.) CSC and the City knew that a valid policy number was needed in order to submit a claim to a private insurance carrier. (U.S. Compl. ¶ 68 ("[A] former third party insurance specialist at [DOH] admitted under oath that having 'a correct policy number' was 'the most important' element of submitting a 'valid claim' to a private insurer."); N.Y. Compl. ¶ 87 (noting that a former project director at CSC stated in an email that "a missing or unusable Policy ID prevents submission" of a claim to private insurance).)

To address the perceived shortfall in Medicaid reimbursement levels, Plaintiffs allege, the City and CSC agreed to implement a fraudulent two-step billing practice for Medicaid-eligible children for whom they had evidence of private insurance coverage but lacked an accurate or complete policy number. First, CSC suggested to the City that its billing software automatically replace any policy number that was "blank or null or [that] has fewer than two letters or numbers" with

"999-999-999" when submitting a claim to a private insurance carrier. (U.S. Compl. ¶ 72; N.Y. Compl. ¶ 90.) The City's EIP Finance Director informed CSC by email that the proposal was "[c]onfirmed and approved" two days later, and CSC began using the practice by June 2010. (U.S. Compl. ¶ 74; N.Y. Compl. ¶¶ 93-94.) Plaintiffs allege that they did so knowing that claims filed with 999-999-999 in the policy number field would be denied by private insurers. (U.S. Compl. ¶ 73; N.Y. Compl. ¶¶ 91-92.) Once the private insurer denied the claim, the City and CSC would submit the claim to Medicaid for reimbursement. (U.S. Compl. ¶ 75; N.Y. Compl. ¶ 96.) Plaintiffs allege that thousands of claims were submitted to private insurers with the default 999-999-999 policy number and then submitted to Medicaid in this manner, and attach a created summary Exhibit of alleged example claims from May 2011 to their respective Complaints. (U.S. Compl. Ex. C at 1-9; N.Y. Compl. Ex. C at 1-40.)

### 3. 0Fill or Dummy RA Claims

Plaintiffs allege that the City and CSC implemented a second billing practice to evade its responsibility to submit claims to private insurers prior to billing Medicaid. Plaintiffs allege that the City and CSC were aware that if New York Medicaid received a claim seeking reimbursement for a patient that, according to its records, had private insurance, and the

13

claim did not indicate the result of a claim for payment to that private insurer, New York Medicaid would deny the claim. (U.S. Compl. ¶ 77; N.Y. Compl. ¶ 99.) Private insurers, however, "very common[ly]" requested additional information prior to adjudicating EIP claims. (U.S. Compl. ¶ 78; N.Y. Compl. ¶ 101.) Plaintiffs allege, quoting a CSC Product Manager, that the City did not have the "capability" or the "staffing" to respond to the volume of requests for additional information that it received. (U.S. Compl. ¶ 78; N.Y. Compl. ¶ 101.)

Plaintiffs allege that, instead of devoting further resources to responding to inquiries from insurers, CSC and the City circumvented the problem by changing CSC's software to automatically create a "Dummy Remittance Advice" ("Dummy RA"), or a code indicating a claim had been denied, when a private insurance claim had been pending for 90 days or more, a period that was later changed to 120 days. (U.S. Compl. ¶¶ 79-80; N.Y. Compl. ¶ 104.) CSC then submitted the claims to Medicaid with a "0FILL modifier," which Plaintiffs allege is intended for situations in which a claim to private insurance had been denied or the party submitting the claim knows that no third party payer will cover the claim. (U.S. Compl. ¶ 81; N.Y. Compl. ¶ 105.) Plaintiffs allege that it did so despite knowing that it was "very likely" that private insurance adjudications were still pending for so many claims because the City had failed to

14

respond to inquiries from the insurers. (U.S. Compl. ¶ 83; N.Y. Compl. ¶ 106.) Indeed, when a City official complained in September 2010 that CSC's failure to obtain Medicaid reimbursements quickly enough had resulted in a revenue shortfall, CSC told the City that it would "resubmit additional claims that can benefit from 0FILL logic." (U.S. Compl. ¶ 84; N.Y. Compl. ¶ 107.) Plaintiffs allege that thousands of claims were submitted to Medicaid in this manner, and attach a created summary Exhibit of alleged example claims[5] from May 2011 to their respective Complaints. (U.S. Compl. Ex. D; N.Y. Compl. Ex. D.)

### 4. ICD-9 Claims

The Government further alleges that, during a series of meetings that took place shortly after the City selected CSC to be its new fiscal agent, the City and CSC discussed New York Medicaid's requirement that claims contain a valid ICD-9 code, which indicates the patient's diagnosis. (U.S. Compl. ¶¶ 33, 84.) It alleges that the City and CSC were aware that Medicaid

---

[5] Exhibits D to both Complaints are alleged to be illustrative examples of the use of the 0Fill modifier. On the face of those Exhibits, however, it is not clear to the Court how they exemplify the use of the 0Fill modifier, but, in the absence of any issue raised by the Defendants (for whom it may well be apparent) and the standard to be applied by the Court drawing all reasonable inferences in favor of the Plaintiff on a motion to dismiss, and the fact that the Complaints make clear what fraudulent acts by the Defendants are alleged in the 0Fill scheme, the lack of clarity is not fatal to this allegation.

would deny claims that did not include a valid ICD-9 code. (Id.
¶¶ 95-96.)

"[I]nstead of requiring service providers to correct their
ICD-9 coding," the City and CSC agreed, according to the
Government, to use 315.9, which signified an "unspecified delay
in development," as the default ICD-9 code in its submissions to
Medicaid. (Id. ¶¶ 97-99, 101.) Initially, CSC used 315.9 in
place of codes that were not properly formatted; by April 2009,
the Government alleges, CSC expanded its use of 315.9 to
"whenever the provider-generated codes were not on the list [of
codes] that CSC and the City expected Medicaid to pay." (Id. ¶¶
100-04.) The Government alleges that thousands of claims were
submitted to Medicaid in this manner, and attaches two Exhibits
of example claims (from May 2009 and May 2010) to its Complaint.
(Id. Ex. E (May 2009 Claims); Id. Ex. F (May 2010 Claims).)

The Government further alleges that the City and CSC knew
that the ICD-9 practice "likely did not comply" with New York
Medicaid rules. (Id. ¶ 106.) For instance, a CSC manager stated
in a 2009 email that it was "VERY important" for the service
providers to "start sending correct [ICD-9] information" because
what CSC was sending to Medicaid did not align with what
providers were sending to the City. (Id. ¶ 106.) The Government
also alleges that the City's finance director was twice
confronted by – and twice declined to heed the advice of – an

16

assistant director with a message about using a default
diagnosis code in its claims to Medicaid: "we should not be
defaulting any diagnosis codes." (Id. ¶¶ 110-11.)

Finally, the Government alleges that the ICD-9 requirement
was reflected in guidance communications from DOH. It alleges
that in 2003 DOH issued a "guidance memorandum" describing the
information that providers must submit at the time payment is
sought for EIP services, including an "ICD-9 diagnostic code for
the conditions or reasons for which care is provided." (Id. ¶
88.) Additionally, the Government alleges that DOH provided
further guidance in an email that stated that, pursuant to NEW
YORK PUBLIC HEALTH LAW § 2559, medical service providers were
responsible for furnishing municipalities with information to
support Medicaid billing, and municipalities accordingly "should
not create" diagnosis codes. (Id. ¶ 89.)


5. Overpayment Claims

Finally, the State alleges that CSC failed to return
overpayments to Medicaid in a timely manner. It cites six
"example[s]" of CSC receiving a payment from private insurance
after receiving payment in full from Medicaid on the same claim.
(N.Y. Compl. ¶¶ 80-84.) The State further alleges that CSC
"knowingly" failed to return such overpayments to Medicaid "in a
timely fashion if at all." (Id. ¶ 84.)

17

C. Prior Proceedings

Relator is a former Senior Account Manager in the Early Intervention Group at CSC. (Relator Compl. ¶¶ 12-13.) He filed the initial Complaint in this action under seal on March 9, 2012, and a First Amended Complaint on November 15, 2012. (ECF No. 1; ECF No. 12.) On October 27, 2014, the case was unsealed and the Government and the State filed their respective Complaints-in-Intervention. (ECF Nos. 13-14.) Relator filed the SAC, which in large part adopts the Complaints-in-Intervention, on December 12, 2014. (ECF No. 25.) The instant motions to dismiss followed in short order.

## II.   DISCUSSION

A. Legal Standard for a Motion to Dismiss Under Rule 12(b)(6)

For a complaint to survive dismissal under Fed. R. Civ. P. 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "A claim has facial plausibility," the Supreme Court has explained,

> [W]hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the

18

line between possibility and plausibility of entitlement
to relief."

Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Twombly, 550
U.S. at 556–57). "[A] plaintiff's obligation to provide the
grounds of his entitlement to relief requires more than labels
and conclusions, and a formulaic recitation of the elements of a
cause of action will not do." Twombly, 550 U.S. at 555 (internal
quotation marks omitted). "[I]n keeping with these principles,"
the Supreme Court has stated,

> [A] court considering a motion to dismiss can choose to
> begin by identifying pleadings that, because they are no
> more than conclusions, are not entitled to the
> assumption of truth. While legal conclusions can provide
> the framework of a complaint, they must be supported by
> factual allegations. When there are well-pleaded factual
> allegations, a court should assume their veracity and
> then determine whether they plausibly give rise to an
> entitlement to relief.

Iqbal, 556 U.S. at 678.

At this stage of the litigation, the Court must accept as
true the factual allegations in the Complaint and draw all
reasonable inferences in favor of the Plaintiff. See
Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); Blue
Tree Hotels Inv. (Canada) Ltd. V. Starwood Hotels & Resorts
Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). However, this
principle is "inapplicable to legal conclusions," Iqbal, 556
U.S. at 678, which, like the Complaint's "labels and
conclusions," Twombly, 550 U.S. at 555, are disregarded. Nor

should a court "accept as true a legal conclusion couched as a
factual allegation." Id. at 555.

   B. Legal Standard for Particularity Under Rule 9(b)

      As an anti-fraud statute, "claims brought under the FCA
fall within the express scope of Rule 9(b)." Gold v. Morrison-
Knudsen Co., 68 F.3d 1475, 1477 (2d Cir. 1995) (citations
omitted). Rule 9(b) requires that a plaintiff alleging fraud
"state with particularity the circumstances constituting fraud."
Fed. R. Civ. P. 9(b). Knowledge or scienter may be alleged
generally. Id. Generally, to satisfy Rule 9(b)'s particularity
requirement a plaintiff must "(1) specify the statements that
the plaintiff contends were fraudulent, (2) identify the
speaker, (3) state where and when the statements were made, and
(4) explain why the statements were fraudulent." Rombach v.
Chang, 355 F.3d 164, 170 (2d Cir. 2004).

      Critically, in the FCA context, a plaintiff must plead with
particularity a false record or statement and the false claim it
alleges was submitted to the government as a result. U.S. ex
rel. Kester v. Novartis Pharm. Corp., 23 F. Supp. 3d 242, 252-53
(S.D.N.Y. 2014) ("Kester I"). However, as to the latter,
district courts in the Second Circuit have concluded that
"[w]here numerous false claims are involved, the plaintiff may
satisfy Rule 9(b) by providing sufficient identifying

                                20

information about those false claims, or by providing example false claims that enable the defendant to identify similar claims." Id. at 260.

Applying the foregoing standards to the FCA claims alleged here, Plaintiffs' allegations plainly suffice.[6] This Court concurs with the district courts in this circuit that have permitted FCA plaintiffs to rely on example claims on the ground that "it would be impractical, if not impossible, to require that the Government plead the details of each and every false claim." United States v. Wells Fargo Bank, N.A., 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013); see also U.S. ex rel. Kester v. Novartis Pharm. Corp., 41 F. Supp. 3d 323, 335-40 (S.D.N.Y. 2014) ("Kester IV"); In re Cardiac Devices Qui Tam Litig., 221 F.R.D. 318, 332-34 (D. Conn. 2004). CSC, however, argues that Rule 9(b) requires greater particularity than Plaintiffs'

---

[6] CSC argues additionally that the N.Y. Complaint "fails as a matter of law" because its allegations are made "on information and belief." (CSC NY Mem. 19.) However, except as discussed infra, CSC fails to specify where the State's Complaint is conclusory in nature, and instead urges that the Court "need look no further than the first sentence" to dismiss based on its ostensible reliance on allegations made on information and belief. (Id.) Rather than supporting CSC's argument, the cases it cites illustrate that the Court's proper focus is not on boilerplate in the first sentence of the State's Complaint but on the substance of its allegations. See, e.g., U.S. ex rel. DeCarlo v. Kiewit/AFC Enters., Inc., 937 F. Supp. 1039, 1050 (S.D.N.Y. 1996) (noting that "none of [relator]'s operative False Claims Act averments are made on direct knowledge"). CSC's argument accordingly lacks merit.

Exhibits of sample claims provide. More specifically, it argues that those Exhibits "are not claims or original documents" but compilations that lack "any explanation of the methodology used in constructing them." (CSC USA Mem. 22; CSC NY Mem. 20.) Further, CSC objects to the content of the Exhibits on a litany of grounds. For instance, CSC argues that it is "impossible to tell" from the Exhibits whether there was any indicia of private insurance coverage, whether or why private insurance denied coverage on that claim, or whether any such claim was resubmitted and, if it was, the result. CSC likewise argues that the Exhibits referencing 0Fill claims provide an insufficient basis to conclude that any individual claim was not properly adjudicated before it was submitted to Medicare, and that "there is nothing on the face of" the Government's Exhibit of 315.9 claims "that suggests in any way that 315.9 is not a valid ICD-9 code" for any claim contained therein. (CSC USA Mem. 22-24; CSC NY Mem. 20-21.)

CSC misunderstands Rule 9(b)'s requirements. Rule 9(b) does not call for Plaintiffs to plead every conceivable fact about the claims they allege were fraudulent, or to prove its claims at the pleading stage. Rather, "[t]he purpose of Rule 9(b)'s specificity requirement is to provide the defendant with fair notice of a plaintiff's claim and adequate information to frame a response." Wells Fargo, 972 F. Supp. 2d at 615. Plaintiffs

allege, quite obviously, that the sample claims adhere to the pattern of conduct alleged in their respective Complaints; to require Plaintiffs to repeat the facts underpinning those claims in the Exhibits themselves would be an exercise in futility. The factual disputes raised by CSC may at a later stage mature into a defense as to particular claims in Plaintiffs' Exhibits, but they do not evince a lack of particularity in pleading. Indeed, CSC does not assert that it lacks sufficient information to identify the allegedly fraudulent claims it must defend against, nor could it. That is all that Rule 9(b) requires.

The City argues that the Government Complaint is "obscure" as to the legal theory its claims are premised on.[7] (City Mem. 30-31.) However, Rule 9(b) requires particularity in pleading the "circumstances constituting fraud," not the legal theories entitling Plaintiffs to relief. Fed. R. Civ. P. 9(b). The City cites no authority to contradict the Supreme Court's recent holding that the Federal Rules "do not countenance dismissal of

---

[7] The City argues additionally that the Government's Complaint does not "satisfy the FCA's basic requirement of identifying a claim made to the United States" because the City "submits Medicaid claims exclusively to the State." (City Mem. 29.) As another Court in this district has aptly observed: "The argument borders on the frivolous." U.S. ex rel. Feldman v. City of New York, 808 F. Supp. 2d 641, 650 (S.D.N.Y. 2011) ("It is well-established that the FCA 'reaches claims that are rendered false by one party, but submitted to the government by another.'"). This Court agrees with the Court in Feldman that the "causal chain is direct and obvious." Id.

a complaint for imperfect statement of the legal theory
supporting the claim asserted." Johnson v. City of Shelby,
Miss., 135 S. Ct. 346, 346 (2014). The City's argument therefore
lacks merit.


   C. False Claims Act

      The FCA was enacted to indemnify the government against
losses caused by fraud. Mikes v. Straus, 274 F.3d 687, 696 (2d
Cir. 2001) (citing United States ex rel. Marcus v. Hess, 317
U.S. 537, 549, 551–52 (1943)). Liability is incurred where an
individual:

> (A) knowingly presents, or causes to be presented, a
> false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or
> used, a false record or statement material to a false
> or fraudulent claim;
> (C) conspires to commit a violation of [(A) or (B)].

31 U.S.C. §§ 3729(A)(1)(A)-(C).[8] The FCA does not require "proof
of specific intent to defraud"; rather, an individual acts
knowingly where he possesses "actual knowledge" or "acts in
deliberate ignorance . . . [or] reckless disregard" with regard
to falsity. Id. § 3729(B).

---

[8] Congress renumbered the provisions of the FCA in 2009, but its
revisions did not alter the substantive law applicable to
Plaintiffs' claims. U.S. ex rel. Kirk v. Schindler Elevator
Corp., 601 F.3d 94, 113-14 (2d Cir. 2010), rev'd on other
grounds, 563 U.S. 401, (2011).

A claim that is "false or fraudulent" under the FCA may be factually false or legally false. Factual falsity is straightforward: "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." Mikes, 274 F.3d at 696. A defendant who makes a legally false claim "falsely represents that it is in compliance with a particular federal statute or regulation or an applicable contractual term." Kirk, 601 F.3d at 114. Legally false claims take one of two forms. In an express false certification, the claim itself "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." Mikes, 274 F.3d at 698. However, "where no express certification is required, there may still be liability under an 'implied certification theory' . . . 'when the underlying statute or regulation upon which the plaintiff relies expressly states the provider must comply in order to be paid.'" Kirk, 601 F.3d at 114 (citing Mikes, 274 F.3d at 700). Whether asserted on a theory of factual falsity or legal falsity, a false claim "must have influenced the government's decision to pay" and therefore the term "does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions." Mikes, 274 F.3d at 697.

"The NY FCA, enacted on April 1, 2007, is closely modeled on the federal FCA." <u>U.S. ex rel. Bilotta v. Novartis Pharm. Corp.</u>, 50 F. Supp. 3d 497, 509 (S.D.N.Y. 2014). The NY FCA "follows the federal False Claims Act . . . and therefore it is appropriate to look toward federal law when interpreting the New York act." <u>State ex rel. Seiden v. Utica First Ins. Co.</u>, 96 A.D.3d 67, 71, (N.Y. App. Div. 2012). The parties here do not contend that the application of the NY FCA differs in any way from that of the federal FCA.[9] Accordingly, while the Court's discussion will focus on case law pertaining to the federal FCA, its conclusions apply equally to the federal FCA and the NY FCA.

### 1. 999-999-999 and 0Fill Claims

The City and CSC move to dismiss Plaintiffs' claims because, they argue, Plaintiffs have failed adequately to allege (1) that the claims described in the Complaint implicating the 999-999-999 and 0Fill practices were false or fraudulent, or (2) that the City and CSC submitted such claims knowing of their falsity.[10]

---

[9] However, because the NY FCA does not permit claims to be asserted against local governments such as the City, the State asserts claims only against CSC. See N.Y. Fɪɴ. L. § 188(8).

[10] A common thread in Defendants' briefing — indeed, according to CSC the "most telling flaw" in Plaintiffs' case — is that the Government and the State fail to allege that any claim was submitted to Medicaid for services that were not provided, or

Plaintiffs contend that the 999-999-999 and 0Fill claims were false on both an express and implied false certification theory.[11] As to an implied false certification theory, Plaintiffs allege that, in submitting claims to Medicaid, the City and CSC impliedly certified their compliance with 18 N.Y.C.R.R. § 540.6(e) and DOH guidance. Defendants' 999-999-999 and 0Fill claims were accordingly false because they failed to use "reasonable measures to ascertain the legal liability of third parties" prior to billing Medicaid.

Defendants argue (1) that they complied with the legal requirements Plaintiffs highlight, and (2), contrary to

---

that were provided at an incorrect rate, to a child who did not have a valid IFSP, or to a child that was not eligible for Medicaid. (CSC USA Mem. 1-2; see also City Mem. 1-2; CSC USA Mem. 14-15; CSC NY Mem. 1-2, 11-12.) As a result, Defendants argue, the allegedly fraudulent claims were not "aimed at extracting money the government otherwise would not have paid." Mikes, 274 F.3d at 696. Those arguments plainly miss the mark. The FCA clearly imposes liability where, as here, the allegation is not that a service was never provided or was provided to ineligible individuals, but rather that the government placed an express or implied condition on its promise to pay for such service and Defendants falsely certified their compliance with that condition. See, e.g., Kirk, 601 F.3d at 114 (concluding that request for payment under a contract was false based on failure to comply with a reporting requirement related to the employment of veterans); Bilotta, 50 F. Supp. 3d at 537 (concluding that prescription drug reimbursement claims were false based on conduct that violated Anti-Kickback Statute).

[11] The Government also alleges that the 0Fill claims were factually false. (USA Opp'n 30-31.) The Court need not and does not reach this ground because it finds Plaintiffs' claims to be viable under both theories of legal falsity.

Plaintiffs' arguments, they were required only to submit claims to private insurers prior to billing Medicaid, not to have those claims fully adjudicated.[12]

Defendants' compliance argument simply ignores the substance of Plaintiffs' allegations. The City, for instance, argues that it submitted 999-999-999 claims to private insurance prior to billing Medicaid and thus "necessarily . . . employ[ed]

---

[12] The City also argues that it is "exempt . . . from the general requirement that Medicaid pay only after third party liability has been sought" pursuant to a provision of federal law that requires state Medicaid plans to ensure that payment for certain pediatric and prenatal care (termed "EPSDT") is made without regard to third party liability. (City Mem. 16.) The City is wrong. The provision, which effectively requires the State to relieve EIP service providers of the burden of collection efforts, was enacted out of "concern[] that the administrative burdens associated with third party liability collection efforts" might discourage providers of EPSDT from participating in Medicaid. (City Mem. 17 (citing H.R. REP. NO. 99-453, at 544).) However, the provision does not "exempt" the City from anything; rather, it is a condition the State must meet in order to participate in Medicaid. See generally 42 U.S.C. § 1396a. The State, pursuant to its obligation to coordinate "all available resources within the State" and "assign[] financial responsibility . . . to the appropriate agencies," 20 U.S.C. § 1431(a)(10)(B)-(C), has chosen to meet that condition by structuring its EIP program so that "approved costs for an eligible child . . . shall be a charge upon the municipality wherein the eligible child resides." N.Y. PUB. HEALTH L. § 2557(1). In other words, the State has effectively delegated to the City (and other municipalities) its responsibility to pay providers for care and seek reimbursement from third parties. The City's creative argument notwithstanding, the provision of State law under which municipalities are "deemed the provider" of EIP services expressly for billing purposes, N.Y. PUB. HEALTH L. § 2559(3)(a), cannot shoehorn the City into an exemption under a distinct provision of federal law that nowhere employs the term "provider." See 42 U.S.C. § 1396a(a)(25)(E).

reasonable measures" to investigate potentially liable third
parties. (City Mem. 19; see CSC USA Mem. 15-17 (same); CSC NY
Mem. 13-14 (same).) Similarly, focusing on the 90 or 120 days
between its submission of a claim to private insurance and a
subsequent 0Fill claim to Medicaid, the City argues that it
acted reasonably because it was not required to "wait
indefinitely for an express denial" from a private insurer.
(City Mem. 20; see CSC USA Mem. 15-17 (same); CSC NY Mem. 15-16
(same).)

        To the contrary, Plaintiffs' detailed allegations are
sufficient to allege plausibly that Defendants failed to use
"reasonable measures" to bill third parties prior to submitting
claims to Medicaid. Plaintiffs allege that the City and CSC took
no measures to track down valid private insurance policy numbers
prior to submitting 999-999-999 claims, and that they knew that
claims submitted with 999-999-999 instead of a valid policy
number would be rejected by private insurers.[13] Similarly,
Plaintiffs allege that Defendants took no measures to respond to
requests for information from private insurers to whom they had
submitted claims, instead merely running out the clock until

---

[13] The City additionally argues that Plaintiffs' allegations of a
fraudulent scheme are implausible because 999-999-999 was "a
recognized placeholder for missing information." (City Mem. 19.)
The Court is not presently tasked with resolving factual
disputes of the sort raised by the City, and it accordingly does
not consider the argument here.

they could submit claims to Medicaid (claims they allegedly knew

would be paid) with a 0Fill code indicating that private

insurance had denied the claim or paid zero. Those allegations,

taken in the light most favorable to Plaintiffs, do not paint a

favorable picture of Defendants' purported efforts to

investigate third-party reimbursement "in the same manner and to

the same extent" as they would have if Medicaid were not

available. 18 N.Y.C.R.R. § 540.6(e)(2).

The parties spill much ink debating whether private

insurance claims must be "adjudicated" or third party resources

"exhausted" prior to billing Medicaid. On the facts alleged by

Plaintiffs, the Court need not and does not come to any

conclusions regarding the circumstances in which Medicaid

requires such finality. New York Medicaid regulations clearly

require that providers take "reasonable measures" to achieve

that goal, and Plaintiffs have alleged plausibly Defendants'

failure to do so.

Plaintiffs next argue that the 999-999-999 and 0Fill claims

submitted by the City and CSC were express false certifications

insofar as they violated the statement in Defendants' Medicaid

Certifications that "no part of [any claim] has been paid by, or

to the best of my knowledge is payable from any other source

other than" Medicaid. (See US Opp'n 21-22; NY Opp'n 8.) The City

argues that the theory is not viable because it "complied with

all legal requirements" discussed above with respect to
Plaintiffs' implied false certification theory. (City Reply 7-
8.) CSC, for its part, contends that its Medicaid Certifications
were "accurate" because private insurance had denied coverage
(as to the 999-999-999 claims) or failed to pay after 90 or 120
days (as to the 0Fill claims) at the time it submitted claims to
Medicaid. (CSC USA Mem. 17; CSC USA Reply 3-4; CSC NY Mem. 14-
15; CSC NY Reply 3.)

Plaintiffs also state a claim under the express false
certification theory. In light of Plaintiffs' allegations,
Defendants' insistence that their claims were "accurate" and in
compliance with Medicaid rules is not a sufficient grounds for
dismissal. Contrary to Defendants' protestations, Plaintiffs
allege plausibly that, in submitting the 999-999-999 and 0Fill
claims to Medicaid for reimbursement, Defendants violated their
certification that, "to the best of [their] knowledge," no part
of those claims was payable from another source.

Finally, Defendants argue that Plaintiffs fail to allege
that they knowingly presented false claims for payment. (City
Mem. 25-28; CSC USA Mem. 19-20; CSC NY Mem. 15-16.) The Court
has already concluded that Plaintiffs have adequately pleaded
violations of the FCA based on Defendants' express and implied
false certifications, and it rejects Defendants' arguments that
their responsibilities were not clear merely because New York

Medicaid regulations "impose broad standards that require interpretation." (City Mem. 26.) The Second Circuit cases that Defendants rely on are not to the contrary. See U.S. ex rel. Doe v. Taconic Hills Cent. Sch. Dist., 8 F. Supp. 3d 339, 350 (S.D.N.Y. 2014) ("[I]t would have been impossible for the DOE to know that billing Medicaid — using rate codes provided by the State and approved by the Federal government — violated federal law."); U.S. ex rel. Colucci v. Beth Israel Med. Ctr., 785 F. Supp. 2d 303, 316 (S.D.N.Y. 2011), aff'd, 531 F. App'x 118 (2d Cir. 2013) (concluding that it was "not plausible . . . that defendants knew or should have known they were submitting claims that were false" because "no regulations cover the circumstances" surrounding the alleged false claims); U.S. ex rel. Pervez v. Beth Israel Med. Ctr., 736 F. Supp. 2d 804, 814 (S.D.N.Y. 2010) (dismissing claims against auditor based on Relator's failure to "point to any facts indicating how or why an audit performed in conformity with professional guidelines necessarily would have uncovered the falsehoods allegedly contained in" false claims submitted by auditor's client). Moreover, the allegations that go to knowledge are straightforward. Plaintiffs allege, based on email evidence and deposition testimony, that Defendants knew that submitting 999-999-999 claims to private insurers would result in those claims being denied. (U.S. Compl. ¶ 73; N.Y. Compl. ¶¶ 91-92.)

Plaintiffs allege that Defendants also knew, as to the 0Fill claims, that it was "very likely" that private insurance adjudications were still pending for so many claims because the City had failed to respond to inquiries from the insurers. (U.S. Compl. ¶ 83; N.Y. Compl. ¶ 106.) Those allegations suffice to allege that Defendants knowingly violated the FCA.

For the reasons set forth above, Defendants' Motions to Dismiss Plaintiffs' 999-999-999 and 0Fill claims under the FCA are DENIED.


### 2. ICD-9 Claims

The Government[14] argues that Defendants' ICD-9 claims were legally false on both express and implied false certification theories. (U.S. Opp'n 31-37.)

Its express false certification claim fails. The Government relies principally on the statement in Defendants' Medicaid Certifications that "ALL STATEMENTS, DATA AND INFORMATION TRANSMITTED ARE TRUE, ACCURATE AND COMPLETE TO THE BEST OF MY KNOWLEDGE." (Id. 32.)[15] However, that is precisely the sort of

---

[14] The State declined to intervene as to this claim. (See N.Y. Compl.)

[15] The Government also relies nominally on Defendants' certification that, in submitting claims to Medicaid, they agree to be "subject to and bound by all rules [and] regulations" of the DOH as set forth in statutes, regulations and DOH publications. (See U.S. Compl. Exs. A & B.) It is well-settled,

"[g]eneral certification[] of compliance" that will not support express false certification liability under Mikes. Colucci, 785 F. Supp. 2d at 315; see also Mikes, 274 F.3d at 697-98 ("An expressly false claim . . . falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."). Nowhere do the Defendants' Medicaid Certifications particularize the terms "true, accurate and complete" to require the degree of precision in diagnosis data that the Government urges. And, indeed, the Government can point to no cases within the Second Circuit finding express false certification liability under the FCA based on similarly general terms.

The Court's conclusion, moreover, is in keeping with the fact that "not every instance in which a false representation of compliance with a regulatory regime is made will lead to liability." Kirk, 601 F.3d at 114; see also Mikes, 274 F.3d at 697 ("[N]ot all instances of regulatory noncompliance will cause a claim to become false."). The Second Circuit has consistently required that an express false certification concern compliance with a particular statute or regulation in order to avoid the

---

however, that "a claim that there has been an express false certification cannot be premised on anything as broad and vague as a certification that there has been compliance with all 'federal, state and local statutes, regulations, [and] policies.'" Feldman, 808 F. Supp. 2d at 652.

"anomalous" situation in which FCA liability is imposed yet "the alleged noncompliance would not have influenced the government's decision to pay." Mikes, 274 F.3d at 697. Permitting an express false certification claim to proceed based on Defendants' certification that their claims were "true, accurate and complete" would explode that rule and extend the reach of FCA liability to what is technically accurate and complete across every applicable statute and regulation.

Turning to the Government's implied false certification theory, the Court must determine whether accurate and complete diagnosis data was an express condition of Medicaid payment, and if so, whether Defendants' use of a default code in place of provider-generated diagnosis data violated Medicaid's requirements. The Court concludes that the Government has not shown that Medicaid payment was expressly conditioned on the receipt of accurate diagnosis data, and accordingly does not reach the adequacy of Defendants' ICD-9 practice.

The Government's implied false certification theory relies principally on NEW YORK PUBLIC HEALTH LAW § 2559(3)(a), which permitted a municipality to be "deemed the provider" of EIP services "to the extent that the provider has promptly furnished to the municipality adequate and complete information necessary to support the municipality billing." N.Y. PUB. HEALTH L. § 2559(3)(a). Thus, the Government argues, the City and CSC were

permitted to submit claims to Medicaid for reimbursement only "to the extent" that they had received from the medical service provider, inter alia, accurate diagnosis information in the form of a valid ICD-9 code. (U.S. Opp'n 15-16.)

The Government's implied false certification theory fails because § 2559(3)(a) does not "expressly condition[] payment on compliance with a given statute or regulation." Kirk, 601 F.3d at 114. Those Courts in this district that have found an express condition on payment sufficient to support implied false certification liability under the FCA have done so based on language that was, in a word, express. See, e.g., Kirk, 601 F.3d at 115 ("no agency may obligate or expend funds"); Mikes, 274 F.3d at 700 ("no payment may be made"). By contrast, the provision at issue here, which permits a municipality to be "deemed the provider" of EIP services "to the extent" it receives "adequate and complete information necessary to support the municipality billing," does not create an express condition on Medicaid payments to the municipality. See U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc., 38 F. Supp. 3d 398, 409-10 (S.D.N.Y. 2014). Indeed, on a more natural reading, § 2559(3)(a) imposes a condition on medical providers – that they furnish adequate and complete information to municipalities – before they are relieved from billing Medicaid directly.

36

Nor does § 2559(3)(a) condition payment on "compliance with a given statute or regulation." Kirk, 601 F.3d at 114. Instead, it refers to "adequate and complete information necessary to support . . . billing" without mention of the need for a valid ICD-9 diagnostic code. The Government argues that the ICD-9 requirement was codified in guidance provided by DOH. (U.S. Opp'n 35.) However, the DOH guidance does not itself create an express condition of payment and thus it cannot rectify the lack of specificity in § 2559(3)(a). In sum, the Government has failed to allege an implied false certification with the particularity required by the Second Circuit in Mikes, which delimited such claims to express statutory prohibitions on payment where compliance with a particular requirement is lacking.

Finally, the Government contends that Defendants' ICD-9 claims were factually false. The Second Circuit has described a factually false claim as one which provides "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." Mikes, 274 F.3d at 696. Later, in Kirk, the Second Circuit paraphrased its earlier definition: "in other words, the contractor bills for something it did not provide." 601 F.3d at 114. The Government argues here that its ICD-9 claim fits within the definition of "an incorrect description of goods or services provided" under

37

Mikes. (U.S. Opp'n 36-37.) Kirk, however, made it clear that factual falsity is reserved for "straightforward" frauds in which a claim for payment to the Government describes the services provided in a manner that differs from what was actually provided. 601 F.3d at 114. The Government's ICD-9 allegations do not encompass falsity of that nature, nor do they pertain at all to the services provided or the eligibility of the patients who received them. The Government, moreover, provides no Second Circuit authority to support its theory of factual falsity. It accordingly fails.

For the reasons set forth above, Defendants' Motions to Dismiss the Government's ICD-9 claims under the FCA are GRANTED and those claims are DISMISSED WITH PREJUDICE.


### 3. Overpayment Claims

Relator[16] and the State bring claims under the "reverse false claims" provision of the FCA. (N.Y. Compl. ¶¶ 78-86; Relator Compl. ¶¶ 27-29.) That provision imposes liability on any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); see N.Y. FIN. L. §§ 187(1)(h) (parallel provision of NY FCA).

---

[16] The Government declined to intervene as to this claim. (See U.S. Compl.)

The overpayment claims cannot survive Defendants' Motions to Dismiss because the Relator and the State fail to allege that Defendants acted knowingly or with reckless disregard or deliberate ignorance. See 31 U.S.C. § 3729(B); N.Y. Fin. L. § 188(3). The State makes only conclusory allegations that CSC's failure to return overpayments was "knowing[]." (N.Y. Compl. ¶¶ 81, 85.) The Relator Complaint, on the other hand, brings its claim on behalf of the Government and adopts the allegation that "CSC learned in August 2011" of thousands of Medicaid overpayments, many of which were several years old. (See Relator Compl. ¶¶ 1, 27-29; U.S. Compl. ¶ 128.) But the Government Complaint, and therefore the Relator, does not identify particular circumstances in which Defendants had knowledge of a Medicaid overpayment that they failed to rectify. Accordingly, the overpayment claims must be DISMISSED.

### 4. Relator Claims

Both the New York and the Federal FCA permit private persons known as "relators" to file qui tam actions and recover damages on behalf of the state or federal government. See 31 U.S.C. § 3730(b); N.Y. Fin. L. § 190(2). The relator plaintiff "stands in the shoes of the government, which is the real party in interest." U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1154 (2d Cir. 1993). Thus,

"relators have standing to sue not as agents of the United States, but as partial-assignees of the United States' claim to recovery." U.S. ex rel. Eisenstein v. City of New York, 540 F.3d 94, 101 (2d Cir. 2008) (citing Vt. Agency of Nat. Res. V. U.S. ex. Rel. Stevens, 529 U.S. 765, 773-74 (2000)). As a result, when the government elects to intervene pursuant to 31 U.S.C. § 3730(b)(4), "the Government's claims become the operative claims insofar as they are duplicative of those of the relator." Feldman, 808 F. Supp. 2d at 648.

Relator alludes to "several" unique claims asserted in the Relator Complaint yet discusses only one: Relator's FCA § 3729(a)(1)(G) claim on behalf of the United States, which the Court dismissed supra. (Relator City Opp'n 2-3.)

The Court, having conducted its own review of the Relator Complaint, the Government Complaint and the State Complaint, finds no material allegation in the Relator Complaint that would not be duplicative of the Complaints-in-Intervention. The Relator Complaint is accordingly DISMISSED. The Court's dismissal does not alter or impair Relator's continuing statutory rights as set forth in § 3730 of the FCA. 31 U.S.C. § 3730; see Feldman, 808 F. Supp. 2d at 649.

D. Common Law Claims

In addition to their respective FCA claims, the Government asserts claims of unjust enrichment (against the City and CSC) and payment by mistake of fact (against the City), and the State asserts a claim for misappropriation of public property against CSC. (U.S. Compl. ¶¶ 148-54; N.Y. Compl. ¶¶ 127-28.) The City argues that the Government's common law claims must be dismissed for substantially the same reasons as its FCA claims. The Court having rejected those arguments for the reasons discussed supra, the City's Motion to Dismiss the Government's unjust enrichment and payment by mistake of fact claims is DENIED.

CSC argues that Plaintiffs' common law claims must be dismissed because CSC was not enriched at the Government's expense and does not possess any wrongfully obtained State funds. (CSC USA Mem. 20-21; CSC NY Mem. 17-19.) However, given the allegations in both Complaints that CSC's contract with the City was structured to provide incentives in the form of bonus payments based on the total amount of Medicaid reimbursements CSC secured for the City, and that such incentive structures violated federal and state law, it would be premature to dismiss Plaintiffs' common law claims on those grounds. CSC's Motion to Dismiss the Government's unjust enrichment and the State's misappropriation of public property claims is therefore DENIED.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss Plaintiffs' FCA and common law 999-999-999 and 0Fill claims are DENIED. Defendants' Motion to Dismiss Plaintiffs' FCA and common law ICD-9 claims is GRANTED and Plaintiffs' ICD-9 claims are DISMISSED WITH PREJUDICE. Defendants' Motion to Dismiss the overpayment claims asserted by the State and the Relator are also GRANTED. Finally, the Relator Complaint is DISMISSED as duplicative of the operative Complaints-in-Intervention.

Defendants shall file Answers within 30 days of the date of this Order.


SO ORDERED.

Dated:     New York, New York
           April 28, 2016


                              _____
                                    Deborah A. Batts
                              United States District Judge