UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
United States of America ex rel.
Vincent Forcier,

                Plaintiff,

      v.                           12 Civ. 1750 (DAB)
                                  MEMORANDUM AND
                                  ORDER
Computer Sciences Corporation and
The City of New York,

                Defendants.
-------------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     In this qui tam action, Intervenors United States of

America ("U.S." or the "Government") and the State of New York

("N.Y." or the "State") (collectively, "Intervenors") allege

that Defendants the City of New York (the "City") and Computer

Sciences Corporation ("CSC" or "Defendant") violated the federal

False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq., and the New

York False Claims Act ("NY FCA"), N.Y. Finance Law §§ 187 et

seq., by submitting false claims to Medicaid for reimbursement.

CSC has moved to dismiss the Government's First Amended

Complaint-in-Intervention (the "U.S. FAC") and New York's First

Amended Complaint-in-Intervention (the "N.Y. FAC"). For the

reasons that follow, the Motion is DENIED in part and GRANTED in

part.

## I. Factual Background

For the purpose of this Motion, familiarity with the underlying facts is assumed, and the facts as alleged in Intervenors' Amended Complaints are assumed true.[1]  The facts are recited here only insofar as they are relevant to resolving the instant Motion.

### 1. Statutory and Regulatory Framework

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., provides federal funding to states to "develop and implement a statewide . . . interagency system" to provide "early intervention services" for children under three years of age who are experiencing developmental delays or who have "a diagnosed physical or mental condition that has a high probability of resulting in developmental delay." Id. §§ 1431(b)(1), 1433(5)(A). Federal IDEA funding is available to states only to the extent that the costs of evaluation and care for eligible children are not paid for by other sources, including private insurance and Medicaid. Id. § 1440.

In accordance with the IDEA, New York State created the Early Intervention Program ("EIP") to provide services to eligible

---

[1] For a detailed recitation of the facts, see the Court's Memorandum and Order dated April 28, 2016. Intervenors allege additional facts in their Amended Complaints, as outlined below.

children.[2] N.Y. Pub. Health L. ("PHL") §§ 2540-2544. The EIP provides for municipalities, including the City, to pay service providers directly for EIP services rendered to children, and assume responsibility for seeking reimbursement.[3] (U.S. FAC ¶¶ 27-29.) Under State EIP regulations, municipalities seeking reimbursement must, "in the first instance and where applicable, seek payment from private third party insurers, prior to claiming payment from Medicaid or the Department of Health, for services delivered to eligible children and their families." 10 N.Y.C.R.R. § 69-4.22(a). The costs not covered by private insurance or Medicaid are shared equally by the State and the City. PHL § 2557(2) ("[DOH] shall reimburse the approved costs paid by a municipality . . ., other than those reimbursable by [Medicaid] or by third party payors, in an amount of fifty percent of the amount expended.").

Medicaid is a federal program that provides medical care to eligible individuals, including families with low incomes and

---

[2] The Department of Health ("DOH") is the agency responsible for administering the EIP program in New York. See U.S. FAC ¶ 22; PHL § 2541(12).

[3] As described in the Court's previous Order, during the time period relevant here, state regulations provided that, "for the purpose of seeking payment from [Medicaid] or from other third party payors, the municipality shall be deemed the provider of such early intervention services to the extent that the provider has promptly furnished to the municipality adequate and complete information necessary to support the municipality billing." PHL § 2559(3)(a).

persons with certain disabilities, by reimbursing states for health care provided under its auspices. 42 U.S.C. § 1396 et seq. Subject to federal approval and review, states are responsible for establishing and administering their own Medicaid plans, abiding by federal guidelines and paying health care providers for the services they render. State Medicaid plans must in turn seek reimbursement for a portion of their expenditures from the federal Centers for Medicare and Medicaid Services. (N.Y. FAC ¶ 30.)

In their Amended Complaints, Intervenors include the prior claims regarding Defendants' alleged noncompliance with Medicaid's "secondary payor requirement," and also assert new claims based on an allegedly illegal compensation arrangement between CSC and the City. (See U.S. FAC ¶¶ 37-44, 119-26; N.Y. FAC ¶¶ 34-42, 43-45.) With respect to the first set of claims, Intervenors allege noncompliance based on: (1) federal and state Medicaid regulations; (2) New York Medicaid manuals and DOH guidance; and (3) Medicaid Certifications that the City and CSC were required to execute on an annual basis.

First, federal Medicaid regulations require that states "take reasonable measures to determine the legal liability of the third parties who are liable to pay for services" furnished under each state's plan. 42 C.F.R. § 433.138(a); 42 U.S.C. §

4

1396a(25). Similarly, New York Medicaid regulations require providers "[a]s a condition of payment, . . . [to] take reasonable measures to ascertain the legal liability of third parties to pay for medical care and services." 18 N.Y.C.R.R. § 540.6(e)(1). The State regulations further provide that "[n]o claim for reimbursement shall be submitted unless the provider has":

> (i) investigated to find third-party resources in the same manner and to the same extent as the provider would to ascertain the existence of third-party resources for individuals for whom reimbursement is not available under the medical assistance program; and
>
> (ii) sought reimbursement from liable third parties.

Id. § 540.6(e)(2). Although providers are required to submit claims to the state Medicaid plan within 90 days of the service provided, an exception to that rule is permitted for "circumstances outside of the control of the provider," including "attempts to recover from a third party insurer." Id. § 540.6(a)(1).

Under the state regulations, providers submitting a claim for reimbursement are additionally required to: request from the patient "any resources available to pay for medical care and services," id. § 540.6(e)(3)(i); "investigate the possibility of making a claim" to any potentially liable third party and make any "reasonably appropriate" claims, id. § 540.6(e)(3)(iv);

5

continue to investigate sources of third-party reimbursement after submitting a claim to Medicaid "to at least the same extent that such investigations ... would occur in the absence of reimbursement" by Medicaid, id. § 540.6(e)(3)(iii); and "take any other reasonable measures necessary to assure that no claims are submitted to [Medicaid] that could be submitted to another source of reimbursement." Id. § 540.6(e)(3)(v).

Intervenors also point to sources of state regulatory guidance regarding the secondary payor requirement. New York Medicaid's Provider Manual for General Policy, for example, stated that Medicaid will pay for care "only after all [private insurance] resources available for payments have been exhausted," and that private insurance payments "must be received" before submitting a claim to Medicaid. (U.S. FAC ¶ 42.) In addition, New York Medicaid's Provider Manual for Third Party Information advised participants that private insurance "must be utilized for payment . . . prior to submitting claims to the Medicaid Program." (Id.) In 2003, the DOH also allegedly issued guidance stating that, in the event that an "incorrect policy number" is submitted in a claim to private insurance, municipal EIP officials were required to correct the error and resubmit the claim to private insurance before submitting the claim to Medicaid. (Id.)

Finally, Intervenors refer to the annual certification statements ("Medicaid Certification") that Defendants were required to execute as an entity submitting Medicaid claims for reimbursement. 18 N.Y.C.R.R. §§ 504.1(a)(1), 504.9; see also U.S. FAC ¶ 45; N.Y. Compl. ¶¶ 46-54; U.S. FAC Ex. A-B. The Medicaid Certification states, inter alia:

- "[T]he amounts listed are due, and except as noted, no part of [any claim] has been paid by, or to the best of my knowledge is payable from any other source other than [Medicaid]."

- "ALL STATEMENTS, DATA AND INFORMATION TRANSMITTED ARE TRUE, ACCURATE AND COMPLETE TO THE BEST OF MY KNOWLEDGE; NO MATERIAL FACT HAS BEEN OMITTED; I UNDERSTAND THAT PAYMENT AND SATISFACTION OF THIS CLAIM WILL BE FROM FEDERAL, STATE AND LOCAL PUBLIC FUNDS AND THAT I MAY BE FINED AND/OR PROSECUTED UNDER APPLICABLE FEDERAL AND STATE LAWS FOR ANY VIOLATION OF THE TERMS OF THIS CERTIFICATION, INCLUDING BUT NOT LIMITED TO FALSE CLAIMS, STATEMENTS OR DOCUMENTS, OR CONCEALMENT OF A MATERIAL FACT[.]"

- "In submitting claims under this agreement I understand that ... the entity ... shall be subject to and bound by all rules, regulations, policies, standards, fee codes and procedures of the [DOH] ... as set forth in statute or title 18 of the [N.Y.C.R.R.] and other publications of the [DOH], including eMedNY Provider Manuals and other official bulletins of the [DOH]."

(U.S. FAC Ex. A.)

With respect to the new claims included in the Amended Complaints, Intervenors allege regulatory noncompliance based on provisions in the CSC-NYC contract creating an incentive-based compensation arrangement for CSC. Intervenors claim that these

contract provisions violate both state and federal regulations requiring that billing agents' compensation be unrelated to the amount billed to or collected from Medicaid. (See U.S. FAC ¶¶ 119-26; N.Y. FAC ¶¶ 43-45.)

Federal regulations provide that Medicaid reimbursement payments may be made to a business agent, such as a billing service, as long as the agent's compensation is:

> (1) Related to the cost of processing the billing;
>
> (2) Not related on a percentage or other basis to the amount that is billed or collected; and
>
> (3) Not dependent upon the collection of the payment.

42 C.F.R. § 447.10(f). Pursuant to 42 C.F.R. § 447.10(c), state Medicaid plans must ensure compliance with this requirement.

In addition, state regulations provide that business agents may prepare and send Medicaid bills in the name of the provider only if their compensation is "unrelated, directly or indirectly, to the dollar amounts billed and collected; and . . . not dependent on actual collection of payments." 18 N.Y.C.R.R. § 360-7.5(c). Likewise, payments may only be made to an agent if the "agent's compensation for the services is related to the cost of processing the claim, is not related on a percentage or other basis to the amount billed or collected, and is not dependent upon collection of the payment." Id. § 504.9(a)(1).

The regulations define the receipt of "payment through any person whose compensation is . . . related to the amount collected or is dependent upon collection of the payment" as an "unacceptable practice," which subjects such payments to possible recoupment by Medicaid. Id. §§ 515.2(b)(14), 515.3(b). A DOH guidance document issued in 2001 reiterates that billing agents "charging Medicaid providers a percentage of the amount claimed or collected" could lead to the State seeking refunds of payments made to such agents. (U.S. FAC ¶ 122.)

2. Allegations in the Amended Complaint

In their Amended Complaints, Intervenors repeat the factual allegations from their initial Complaints regarding Defendant's attempts to evade the secondary payor requirement through the Nine-9 and 0Fill schemes. Intervenors also allege that Defendant fraudulently induced the State into approving its enrollment as a billing agent by concealing its incentive payment arrangement with the City, and then submitted numerous claims to Medicaid despite its illegal fee arrangement.

The Court briefly repeats the facts regarding the Nine-9 and 0Fill schemes set forth more fully in the April 26, 2016 Memorandum and Order. Under the Nine-9 scheme, Defendant is alleged to have submitted claims to private insurers for

9

children with evidence of private coverage—but inaccurate or incomplete policy numbers—by filling nine "9s" into the policy number field on the claims, instead of obtaining correct policy numbers from the families prior to submission. (See U.S. FAC ¶¶ 71-77; N.Y. FAC ¶¶ 87-92.) Defendant allegedly did so despite knowing that claims submitted without a valid policy number would automatically be denied by the insurer. (U.S. FAC ¶¶ 70, 75; N.Y. FAC ¶¶ 88-89.)  When the denial inevitably came, Defendant would then submit the claim to Medicaid for payment. (U.S. FAC ¶ 77; N.Y. FAC ¶ 92.)

Under the 0Fill scheme, Defendant is alleged to have implemented a software program that would identify any claim that had been pending before a private insurer for more than 90 days (later changed to 120) and then submit the claim to Medicaid with a 0Fill modifier, which was intended for situations when the private insurance claim had been denied or Defendant knew there was no third party coverage. (U.S. FAC ¶¶ 82-84; N.Y. FAC ¶¶ 100-2.) Defendant allegedly prepared claims in this manner notwithstanding the fact that it knew that many of the claims only remained pending before insurers because the City had failed to respond to the insurers' requests for additional information prior to adjudicating the claim. (U.S. FAC ¶¶ 80, 85; N.Y. FAC ¶¶ 98-100.)

10

In their Amended Complaints, Intervenors additionally allege that Defendant induced the State to approve its enrollment as a billing agent by concealing its incentive payment arrangement with the City. (See U.S. FAC ¶¶ 124-26; N.Y. FAC ¶¶ 66-69.) This arrangement was created under the CSC-NYC contract, which provided that, if Defendant obtained Medicaid payments above certain "threshold dollar levels," it was entitled to receive an "incentive payment" equal to 15% of the amount of Medicaid payments above the stipulated level. (U.S. FAC ¶ 61.) According to sworn testimony from CSC's Project Manager, CSC personnel "collectively . . . felt" that it was "not appropriate . . . to have an incentive clause based on a percentage" of collections in its contract, and discussed its concerns "numerous" times both internally and with the City. (U.S. FAC ¶ 124; N.Y. FAC ¶ 67.) Despite these concerns, however, the incentive provisions remained part of the contract. (Id.)

CSC's corporate predecessor submitted an application to the State to be a billing agent[4] in January 2008. (U.S. FAC ¶ 125;

---

[4] CSC refers to this form both as an "application form" and the "Service Bureau Information Request Form" in its opposition papers. (See Def.'s MTD the U.S. FAC at 10 and 7 n.6.) CSC appears to take issue with Intervenors' labeling of the form as a "billing agent" application form, but does not contest that the form was part of its enrollment application. For purposes of this Order, the Court refers to it as an enrollment application.

N.Y. FAC ¶ 68.) This application directed CSC to "[p]rovide a copy of the fee schedule [it] will be using to charge for [its] services." (U.S. FAC ¶ 123; N.Y. FAC ¶ 68; Voth Decl. Ex. E, item 4.) In response, CSC stated only that its contract provided for a "monthly fixed fee for Fiscal Agent operations support," while omitting mention of the incentive pay provisions. (U.S. FAC ¶ 125; N.Y. FAC ¶ 68.) Thereafter, Medicaid authorized its enrollment as a billing agent. (U.S. FAC ¶ 126; N.Y. FAC ¶ 68.)

## II. Discussion

1. Legal Standards

   a. Standard for a Motion to Dismiss Under Rule 12(b)(6)

For a complaint to survive dismissal under Fed. R. Civ. P. 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility," the Supreme Court has explained,

> [W]hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."

Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 556-57, 127 S.Ct. 1955). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotation marks omitted). "[I]n keeping with these principles," the Supreme Court has stated,

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

At this stage of the litigation, the Court must accept as true the factual allegations in the Complaint and draw all reasonable inferences in favor of the Plaintiff. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). However, this principle is "inapplicable to legal conclusions," Iqbal, 556 U.S. at 678, 129 S.Ct. 1937,

which, like the Complaint's "labels and conclusions," <u>Twombly</u>,
550 U.S. at 555, 127 S.Ct. 1955, are disregarded. Nor should a
court "accept as true a legal conclusion couched as a factual
allegation." <u>Id.</u> at 555, 127 S.Ct. 1955.


      b. Standard for Particularity Under Rule 9(b)

     As an anti-fraud statute, "claims brought under the FCA
fall within the express scope of Rule 9(b)." <u>Gold v. Morrison-
Knudsen Co.</u>, 68 F.3d 1475, 1477 (2d Cir. 1995) (citations
omitted). Rule 9(b) requires that a plaintiff alleging fraud
"state with particularity the circumstances constituting fraud."
Fed. R. Civ. P. 9(b). Knowledge or scienter may be alleged
generally. <u>Id.</u> Generally, to satisfy Rule 9(b)'s particularity
requirement a plaintiff must "(1) specify the statements that
the plaintiff contends were fraudulent, (2) identify the
speaker, (3) state where and when the statements were made, and
(4) explain why the statements were fraudulent." <u>Rombach v.
Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004).

     In the FCA context, a plaintiff must plead with
particularity a false record or statement and the false claim it
alleges was submitted to the government as a result. <u>U.S. ex
rel. Kester v. Novartis Pharm. Corp.</u>, 23 F. Supp. 3d 242, 252–53
(S.D.N.Y. 2014). However, as to the latter, district courts in

14

the Second Circuit have concluded that "[w]here numerous false claims are involved, the plaintiff may satisfy Rule 9(b) by providing sufficient identifying information about those false claims, or by providing example false claims that enable the defendant to identify similar claims." Id. at 260.

Defendant does not renew its previous arguments regarding particularity under Rule 9(b) in relation to the Amended Complaints. Thus, the Court incorporates its reasoning from the previous Order and finds that the Amended Complaints satisfy the standards of Rule 9(b).

## 2. False Claims Act

The FCA was enacted to indemnify the government against losses caused by fraud. Mikes v. Straus, 274 F.3d 687, 696 (2d Cir. 2001) (citing United States ex rel. Marcus v. Hess, 317 U.S. 537, 549, 551–52 (1943)). Liability is incurred where an individual:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of [(A) or (B)].

31 U.S.C. §§ 3729(A)(1)(A)-(C).  The FCA does not require "proof of specific intent to defraud"; rather, an individual acts knowingly where he possesses "actual knowledge" or "acts in deliberate ignorance . . . [or] reckless disregard" with regard to falsity. Id. § 3729(B).

A claim that is "false or fraudulent" under the FCA may be factually false or legally false. Factual falsity is straightforward: "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." Mikes, 274 F.3d at 696. A defendant who makes a legally false claim "falsely represents that it is in compliance with a particular federal statute or regulation or an applicable contractual term." Kirk, 601 F.3d at 114. Legally false claims take one of two forms. In an express false certification, the claim itself "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." Mikes, 274 F.3d at 698. However, "where no express certification is required, there may still be liability under an 'implied certification theory.'" Kirk, 601 F.3d at 114 (citing Mikes, 274 F.3d at 700). The standards governing implied certification claims are disputed in this action, and discussed in greater detail below.

Whether asserted on a theory of factual falsity or legal falsity, a false claim "must have influenced the government's decision to pay" and therefore the term "does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions." Mikes, 274 F.3d at 697. Put differently, "the misrepresentation must [have been] material to the other party's course of action." Universal Health Servs., Inc. v. U.S. and Mass. ex rel. Escobar ("Escobar"), 136 S.Ct. 1989, 2001 (2016).

"The NY FCA, enacted on April 1, 2007, is closely modeled on the federal FCA." U.S. ex rel. Bilotta v. Novartis Pharm. Corp., 50 F. Supp. 3d 497, 509 (S.D.N.Y. 2014). The NY FCA "follows the federal False Claims Act . . . and therefore it is appropriate to look toward federal law when interpreting the New York act." State ex rel. Seiden v. Utica First Ins. Co., 96 A.D.3d 67, 71, (N.Y. App. Div. 2012). Because the Parties do not contend that the application of the NY FCA differs in any way from that of the federal FCA, the Court's discussion will focus on case law pertaining to the federal FCA, but its conclusions apply equally to the federal FCA and the NY FCA.

a. Incentive Payment Provisions Claims

Intervenors allege that the inclusion of the incentive payment provisions in the CSC-NYC contract renders Defendant

17

liable under both implied false certification and fraudulent inducement theories of liability. Defendant disputes that the provisions violate any applicable regulations, and claims that Intervenors fail to make out a claim under either theory.

### i. The Regulations

Defendant argues that the regulations cited by Intervenors do not apply to the provisions in the CSC-NYC Contract because: (1) the regulations only apply when a provider reassigns its right to Medicaid payment, which the City did not do here; and (2) the regulations concern compensation actually paid to a billing agent, and not hypothetical payments.

The first argument is based on the fact that the relevant federal regulation, 42 C.F.R. § 447.10, is entitled "Prohibition against reassignment of provider claims." See 42 C.F.R. § 447.10. Defendant argues that because the City did not reassign its right to payment, the regulation does not apply. Defendant also claims that the enabling statute, 42 U.S.C. § 1396a(a)(32), is concerned only with the "factoring" of Medicaid receivables, or the selling of receivables to collection agencies who then present them to the state for payment. Because the regulation excludes business agents, like Defendant, from the definition of

a "factor," Defendant claims that it cannot serve as a basis for liability.

Defendant engages in a selective reading of the regulation that falls apart upon closer scrutiny. 42 C.F.R. § 447.10(d) states that Medicaid "[p]ayment[s] may be made only" to the provider, the beneficiary, or "[i]n accordance with paragraphs (e), (f), and (g) of this section." Relevantly, paragraph (f) provides that payment may be made to:

> Business agents. Payment may be made to a business agent, such as a billing service or an accounting firm, that furnishes statements and receives payments in the name of the provider, if the agent's compensation for this service is—
>
> > (1) Related to the cost of processing the billing;
> >
> > (2) Not related on a percentage or other basis to the amount that is billed or collected; and
> >
> > (3) Not dependent upon the collection of the payment.

42 C.F.R. § 447.10(f). Paragraph (h) then explicitly states that "[p]ayment for any service" made "to or through a factor" is prohibited. 42 C.F.R. § 447.10(h). A "factor," the regulation defines, "does not include a business representative as described in paragraph (f) of this section." 42 C.F.R. § 447.10(b).

As is apparent from the language above, while the regulation indeed prohibits payment to factors, nowhere is the

regulation's scope limited solely to factors. Instead, 42 C.F.R.
§ 447.10(d) clearly states that payment may only be made to a
provider, a beneficiary, or in accordance with paragraphs (e),
(f), and (g) of the regulation; under paragraph (f), payment
made be made to a business agent, such as Defendant, but only so
long as the agent's compensation is unrelated to the amount
billed or connected.

This reading of the regulation is supported by its stated
"[b]asis and purpose:" to "implement[] section 1902(a)(32) of
the Act[,] which prohibits State payments for Medicaid services
to anyone other than a provider or beneficiary, except in
specified circumstances." 42 C.F.R. § 447.10(a). The
regulation's enabling statute likewise states that a state plan
for medical assistance must:

> [P]rovide that no payment under the plan . . . shall
> be made to anyone other than such individual or the
> person or institution providing such care or service,
> under an assignment or power of attorney or otherwise;
> except that—
>
> . . .
>
> (B) nothing in this paragraph shall be construed . . .
> to preclude an agent of such person or institution
> from receiving any such payment if (but only if) such
> agent does so pursuant to an agency agreement under
> which the compensation to be paid to the agent for his
> services for or in connection with the billing or
> collection of payments due such person or institution
> under the plan is unrelated (directly or indirectly)
> to the amount of such payments or the billings
> therefor, and is not dependent upon the actual
> collection of any such payment.

42 U.S.C. § 1396a(a)(32). Thus, under both the regulation and the statute, payments to a business agent like Defendant are permissible, but only if the agent's compensation is unrelated to the amount billed or collected. This, Intervenors claim, is where Defendant failed to comply with the regulations.

Accordingly, the heading of 42 C.F.R. § 447.10 is unremarkable. The regulation simply sets forth a general prohibition against payments to third parties and then lists a number of exceptions, including, relevantly, the exception for business agents that Defendant is alleged to have violated. While the Court finds this interpretation of the regulation perfectly in line with its title, even if there were an inconsistency, "[i]t is well established that 'the title of a statute cannot limit the plain meaning of its text.'" U.S. v. Epstein, 620 F.3d 76, 80 (2d Cir. 2010) (quoting Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212 (1998)).

Further, Intervenors claim that the provisions also violate two state regulations, 18 N.Y.C.R.R. § 360-7.5(c) and 18 N.Y.C.R.R. § 504.9(a)(1), whose applicability Defendant does not refute.[5] These regulations contain clear prohibitions against the

---

[5] Defendant appears to argue that the New York Medicaid's Provider Manual for General Policy indicates that the scope of the state regulations is limited to factoring. However, the manual simply repeats the general prohibition against

type of payment arrangement contained in the CSC-NYC contract. See 18 N.Y.C.R.R. § 360-7.5(c) ("[A business] agent may prepare and send bills and receive MA payments . . . only if the compensation paid to the agent is . . . unrelated, directly or indirectly, to the dollar amounts billed and collected."); 18 N.Y.C.R.R. § 504.9(a)(1) ("[P]ayment may be made only to . . . a business agent . . . [if] the agent's compensation for the services is related to the cost of processing the claim, is not related on a percentage or other basis to the amount billed or collected, and is not dependent upon collection of the payment."). Thus, on their face, both the state and federal regulations apply to the challenged incentive provisions.

As a final matter, Defendant argues that the regulations do not apply because they are concerned only with incentive-based payments actually disbursed to an entity—payments which, Defendant claims, it never received. Defendant cites no case law in support of this argument, and it is unclear how the regulations could permit incentive-based payment arrangements

_____

reassignment and factoring and then states that "no payment . . . can be made to anyone other than the provider," except in the circumstances set forth in the regulations. (Voth Decl. Ex. C at 33.) On its face, this argument fails for the same reason that Defendant's reading of the federal regulation does. Further, because the text of the state regulations is not ambiguous, the policy manual could not alter its meaning in this respect. See Visiting Nurse Serv. of N.Y. Home Care v. N.Y.S. Dep't of Health, 5 N.Y.3d 499, 506 (2005).

while prohibiting incentive-based pay. Nevertheless, here, the compensation received by Defendant was indeed "related . . . to the amount billed or collected," 18 N.Y.C.R.R. § 504.9(a)(1): because Defendant collected under the threshold amount, it received the flat fee, as opposed to the 15% enhancement it would have received had its collections exceeded the threshold.

Therefore, the Court finds that the incentive payment provisions in the CSC-NYC contract fall within the scope of the regulatory prohibitions.

### ii. Fraudulent Inducement Theory

Intervenors allege that Defendant fraudulently induced Medicaid to approve its enrollment as a billing agent by misrepresenting its compensation arrangement on the enrollment application. Specifically, in response to the application's instruction to provide the fee schedule that it would be using, Defendant stated only that it would receive "a monthly fixed fee for Fiscal Agent operations support," while omitting mention of the incentive payment provisions in its contract. (See U.S. FAC ¶ 125.)

Under the fraudulent inducement theory, a party may incur FCA liability where it used "fraudulent information to induce the Government to provide" a contract, even where the subsequent

claims made pursuant to this contract were not, in and of themselves, false.[6] U.S. v. Wells Fargo Bank, N.A., 972 F. Supp. 2d 593, 623 (S.D.N.Y. 2013) (quotation marks omitted); see also U.S. ex rel. Feldman v. van Gorp, 697 F.3d 78, 91 (2d Cir. 2012) ("If the government made payment based on a false statement, then that is enough for liability in an FCA case, regardless of whether that false statement comes at the beginning of a contractual relationship or later."); Swanson v. Battery Park City Auth., 15-CV-6938 (JPO), 2016 WL 3198309, at *4 (S.D.N.Y. June 8, 2016).

Defendant argues that this theory does not apply because its representation on the enrollment application—that its compensation was based on a fixed monthly fee—was, in fact, true. True or not, Defendant ignores that a statement need not contain "express falsehoods" to be actionable under the FCA. Escobar, 136 S.Ct. at 1999. As the Supreme Court recently held, half-truths, or "representations that state the truth only so far as it goes, while omitting critical qualifying information," can also give rise to FCA liability. Id. at 2000. In fact, "[a] statement that contains only favorable matters and omits all

---

[6] The Government's opposition papers seem to construe Defendant's argument as denying the existence of fraudulent inducement as an available theory of liability. Defendant's reply papers make clear that it does not dispute the availability of such a theory, only the applicability in this case.

reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." Id. at 2001 n.4 (quoting Restatement (Second) of Torts, § 529, Comment a, pp. 62-63 (1976)).

Defendant's statement on the enrollment application is a classic half-truth. In response to the direction to provide its fee schedule, Defendant disclosed only that it would receive a monthly fixed fee, but not that it would also receive a bonus if its Medicaid collections exceeded a threshold amount. Indeed, the fraudulent nature of this representation is underscored by the fact that Defendant's own personnel apparently believed that the incentive payment provisions were inappropriate. See N.Y. FAC ¶ 67; Restatement Second of Torts § 529, Comment b ("Whether or not a partial disclosure of the facts is a fraudulent misrepresentation depends upon whether the person making the statement knows or believes that the undisclosed facts might affect the recipient's conduct in the transaction in hand.").

Defendant nonetheless contends that there was no fraudulent inducement because (1) Medicaid was aware of the incentive payment provisions, and (2), at least in other contexts, Defendant made no effort to conceal them. With respect to the first argument, Defendant claims that Medicaid's knowledge of the provisions may be inferred from the fact that the enrollment

25

application directed applicants to submit a copy of their fee schedule. As for the second argument, Defendant claims that the provisions were openly discussed in a publicly available report put out by the New York City Independent Budget Office (the "IBO report").

Neither argument is availing. The State alleges that it had no knowledge of the provisions, and at this stage of the litigation, this allegation is presumed to be true. See Blue Tree Hotels, 369 F.3d at 217. Moreover, Defendant does not dispute that it never provided a copy of its fee schedule as the application directed. Defendant's suggestion that the State could have known about the provisions, had Defendant properly submitted its fee schedule, is simply insufficient to negate Intervenors' allegations to the contrary.

Defendant's claim regarding the IBO report's purportedly open discussion of the provisions is similarly irrelevant. This report was not mentioned in the Amended Complaints, was not issued to or by a State agency, and was, in any case, issued after the commencement of this action. (See Voth Decl. Ex. D.) Thus, even if the report's discussion of the provisions were to be considered, it reveals nothing about Defendant's efforts to conceal the incentive payment provisions in its enrollment application.

In its reply papers, Defendant reframes this argument, and claims that the facts surrounding the IBO report and Defendant's failure to append its fee schedule demonstrate the immateriality of Defendant's representation to the State's approval decision. But Defendant's failure to attach its fee schedule does not show that the State would have approved its application notwithstanding knowledge of the incentive pay provisions, particularly when Defendant's representation on the application indicated only that it was compensated on a fixed-fee basis. Nor does a report issued by a municipal agency unrelated to State Medicaid create an inference that Medicaid had "actual knowledge" of the provisions, as might weigh against a finding of materiality. Escobar, 136 S.Ct. at 2003-4. Certainly, it does not prove that Defendant was oblivious to the possible impact of these provisions; to the contrary, CSC's Project Manager testified that CSC personnel collectively believed that the provisions were inappropriate. (N.Y. FAC ¶ 67.) The fact that the enrollment application specifically inquired about applicants' fee arrangements—and the fact that Defendant elected to omit mention of the incentive payment provisions in its response—shows that Defendant was likely aware that full disclosure could affect the State's approval decision.

In sum, Defendant does not present a persuasive reason to dismiss the fraudulent inducement claim.

### iii. Implied False Certification Theory

Defendant also argues that Intervenors' implied false certification claim based on the incentive payment provisions fails. Specifically, Defendant contends that Intervenors do not allege the facts necessary to satisfy the new standard for implied false certification claims set forth in Escobar.

In Escobar, the Supreme Court, resolving a circuit split regarding the viability of the implied false certification theory, held that:

> [T]he implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

136 S.Ct. at 2001. However, the Court found that it "need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment," such that every failure to disclose a violation of a material legal requirement could be found misleading: the claims in Escobar did "more than merely demand payment," but contained half-truths, and thus, were actionable misrepresentations. Id. at 2000.

Since Escobar, district and circuit courts alike have
struggled with whether Escobar's holding limited the scope of
the implied false certification theory as a whole, or simply
defined one situation in which liability may arise under this
theory—i.e., where a claimant's representations amount to half-
truths. This confusion arises both from the Court's use of the
phrase "at least" when defining the conditions for potential FCA
liability, and from its express refusal to resolve whether all
claims implicitly represent legal entitlement to payment (and,
no less, the import of such a representation).

While the Second Circuit has yet to address this issue, the
majority of district courts in this Circuit have interpreted
Escobar's holding as creating affirmative limitations on implied
false certification claims, such that liability may only attach
where (1) the claim makes specific representations about the
goods or services provided, and (2) the failure to disclose
noncompliance with material legal requirements renders these
representations misleading half-truths. See N.Y. ex rel. Khurana
v. Spherion Corp., No. 15 Civ. 6605 (JFK), 2016 WL 6652735, at
*14 (S.D.N.Y. Nov. 10, 2016) ("Recently, the U.S. Supreme Court
held that the implied false certification theory is viable where
two conditions are met: (1) the claim does not merely request
payment, but also makes specific representations about the goods
or services provided...." (internal quotation marks omitted));

U.S. ex rel. Tessler v. City of N.Y., No. 14-CV-6455 (JMF), 2016
WL 7335654, at *4 (S.D.N.Y. Dec. 16, 2016) ("[A]s to the
[implied false certification claim], Relators fail to identify a
sufficiently 'specific' representation about the services
provided to sustain an FCA claim."); U.S. ex rel. Kolchinsky v.
Moody's Corp., No. 12cv1399, 2017 WL 825478, at *5 (S.D.N.Y.
Mar. 2, 2017) ("As the Supreme Court recently explained, an FCA
complaint premised on implied certification *must* satisfy two
conditions: first, the claim ... makes specific representations
about the goods or services provided; and second, the
defendant's failure to disclose non compliance with material
statutory, regulatory, or contractual requirements makes those
representations misleading half-truths." (emphasis added)
(quotation marks omitted)); U.S. v. N. Adult Daily Health Care
Ctr., 205 F. Supp. 3d 276, 295 (E.D.N.Y. 2016) ("The Supreme
Court held that the implied false certification theory can be a
basis for liability where two conditions are satisfied. . . ."); 
Ameti ex rel. U.S. v. Sikorsky Aircraft Corp., No. 3:14-cv-1223
(VLB), 2017 WL 2636037, at *8 (D. Conn. June 9, 2017) (citing
Escobar as "requiring a claim to make specific representations
about the goods or services provided and for the
misrepresentation to be material." (internal quotation marks
omitted)). But see U.S. ex rel. Wood v. Allergan, Inc., No. 10-
CV-5645 (JMF), 2017 WL 1233991, at *27 (S.D.N.Y. Mar. 31, 2017)

("After Escobar, liability under the implied certification
theory does not . . . require a showing that the submitted
claims amount to misleading half-truths, as the Escobar Court
expressly refrained from defining the outer limit of implied
certification claims." (quotation marks and citation omitted)).
The Court agrees with the majority view in this Circuit, and
finds that Intervenors' implied false certification claim may
proceed only if Defendant made specific representations that
were rendered misleading by its failure to disclose
noncompliance with material regulatory requirements.[7]

Intervenors argue that even if this standard applies,
Defendant here has satisfied it. With respect to the first
Escobar condition, Intervenors contend that the submitted claims
included "specific representations" about the cost of the EIP
services provided as well as the existence of beneficiaries'
third party coverage.

Even assuming that these could be considered "specific
representations," however, it is hard to see how Defendant's
failure to disclose its incentive-based fee structure

---

[7] Defendant appears, at times, to contend that the Escobar
conditions apply to Defendant's fraudulent inducement claim, as
well. Because Defendant does not explain how a holding expressly
relating to the implied certification theory would apply equally
to fraudulent inducement claims—and because Defendant does not,
indeed, even make this argument explicit—the Court does not
address it.

"render[ed] [these] representations misleading with respect to the goods or services provided." Escobar, 136 S.Ct. at 1999. Defendant's compensation arrangement with the City had nothing to do with the services provided, and the rates of such services and existence/nonexistence of private insurance coverage are not the type of representations that would lead a reasonable person to conclude *anything* about its compensation arrangement—much less that it was on a fixed-fee basis. See id. at 2000 ("Anyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably—but wrongly—conclude that the clinic had complied with core Massachusetts Medicaid requirements . . . that, at a minimum, the social worker possesses the prescribed qualifications for the job."). Thus, it is not clear how Defendant's failure to disclose its regulatory noncompliance with respect to its fee structure rendered the cited statements— or anything else in its claims—actionable misrepresentations.[8]

---

[8] Intervenors argue that interpreting Escobar in this way would prevent the FCA from reaching parties who were never legally entitled to submit claims in the first place. However, where parties, like Defendant, have used deception to receive an entitlement that they otherwise would not have, there is no reason why they may not be pursued (like Defendant) under a fraudulent inducement theory of liability.

Because Intervenors do not adequately plead implied false certification liability with respect to the incentive payment provisions, these claims will be dismissed.

### b. 999-999-999 and 0Fill Claims

Defendant argues that the Nine-9 and 0Fill claims that survived the first round of Motions to Dismiss also fail under the new materiality standard set forth in Escobar.

In Escobar, the Court held that materiality "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." 136 S.Ct. at 2002 (quotation marks, citation, and alteration omitted). Thus, contrary to the earlier standard in the Second Circuit, courts must now take a holistic view of the circumstances to determine if regulatory compliance is material—"the Government's decision to expressly identify a provision as a condition of payment is relevant" to the materiality determination, "but not automatically dispositive." Id. at 2003. Proof of materiality can also include, but is not limited to:

> [E]vidence that the defendant knows that the
> Government consistently refuses to pay claims in the
> mine run of cases based on noncompliance with the
> particular statutory, regulatory, or contractual
> requirement. Conversely, if the Government pays a
> particular claim in full despite its actual knowledge
> that certain requirements were violated, that is very
> strong evidence that those requirements are not

material. Or, if the Government regularly pays a
particular type of claim in full despite actual
knowledge that certain requirements were violated, and
has signaled no change in position, that is strong
evidence that the requirements are not material.

Id. at 2003-4.

As discussed in the Court's previous Order, compliance with
18 N.Y.C.R.R. § 540.6's "reasonable measures" requirement was a
condition of Defendant receiving payment. See 18 N.Y.C.R.R. §
540.6(e)(1). Defendant was also required to expressly certify on
the Medicaid Certification that, to the best of its knowledge,
no claim that it submitted was payable by a source other than
Medicaid. Indeed, Medicaid allegedly designed and implemented a
computer program to identify claims showing an existence of
private coverage but no final adjudication, and Medicaid would,
in fact, systematically reject claims where there was evidence
of third party coverage. (See U.S. FAC ¶ 79; N.Y. FAC ¶ 72.) The
Nine-9 and 0Fill schemes were allegedly Defendant's attempt to
circumvent these computer programs.  (See U.S. FAC ¶ 81.) Taken
together, these allegations demonstrate that Defendant "knew or
had reason to know that [Medicaid] attaches importance to" the
secondary payor requirement, and thus, establish materiality.
Escobar, 136 S.Ct. at 2003 (quotation marks omitted).

Defendant, however, argues that the structure of the
regulations indicates that materiality cannot be assessed at the

34

point of claims submission. Defendant points out that while, under the federal regulations, a state Medicaid agency must pay claims for which "the probable existence of third party liability cannot be established . . . at the time the claim is filed," 42 C.F.R. § 433.139(c), the establishment of third party liability *itself* only "takes place when the agency receives confirmation from the provider or a third party resource." 42 C.F.R. § 433.139(b)(1). If such liability is established after a claim has been paid, Medicaid must then seek recovery of reimbursement. Id. § 433.139(d)(2).  Under the New York state regulations, a party similarly need only take "reasonable measures" to ascertain third party liability before claim submission, 18 N.Y.C.R.R. § 540.6(e)(1); post-submission, the party must continue investigating third party liability and reimburse Medicaid for any recovery later received. Id. §§ 540.6(e)(3)(iii), (e)(4).

Defendant does not make clear how, under the materiality standard set forth in Escobar, the structure of the regulations alters the Court's earlier conclusion with respect to these claims. Presumably, Defendant's argument is that no violation of these regulations could ever be material to Medicaid's payment decision because, at the time of claim submission, the regulations do not require certainty regarding the existence of third party coverage. Nonetheless, it bears repeating that the

regulations required Defendant to use "reasonable measures" to ascertain third party liability prior to claim submission, 18 N.Y.C.R.R. § 540.6(e)(1), and this is exactly what the Court found that it had allegedly failed to do. See April 28, 2016 Memorandum and Order at 29.

Defendant also argues that compliance with the secondary payor requirement could only have been material if there were in fact private insurance coverage for specific EIP claims submitted, and if Medicaid was never reimbursed for these claims. According to Defendant, it is "implausible" that so many families with incomes low enough to qualify for Medicaid would nevertheless have private coverage for EIP services. (Def.'s MTD at 13.)

Whether there were families with both Medicaid and private insurance coverage for EIP services is a factual issue inappropriate for resolution at this stage of the proceedings. Regardless, the number of families with dual coverage—even if insignificant—is unrelated to Defendant's regulatory obligation to use reasonable measures to assess third party liability prior to submitting a claim for payment.

Defendant finally argues that the express false certification claims must be dismissed. In a footnote, Defendant contends that the Court's prior conclusion with respect to these

claims was incorrect because the Court's Order relied on misquoted language from Defendant's Medicaid Certification statement. Specifically, the Certification statement required Defendant to certify that "the amounts listed are due and, except as noted, no part thereof has been paid by, or to the best of my knowledge is payable from any other source other than the Medical Assistance Program." (U.S. FAC Ex. B.) However, the Order's recitation of this provision omitted the "except as noted" language. See April 26 Memorandum & Order at 30.

Defendant's argument lacks merit. Defendant does not claim that it "noted" on the Certification when claims were payable by third party sources. To the contrary, Intervenors allege that Defendant did *not* note that the claims submitted may have been payable by third party sources, but, instead, falsely certified that they were not. There is thus no salient reason why the omitted language would impact the decision that the Court has already reached on this issue.

Accordingly, the Court's prior decision regarding the Nine-9 and 0Fill claims remains in full force, and these claims may proceed.

c. Common Law Claims

Defendant's final argument relates to Intervenors' claims for misappropriation and unjust enrichment. This issue was already ruled upon in the Court's earlier decision, and thus constitutes the law of the case. See Grimes v. Fremont Gen. Corp., 933 F. Supp. 2d 584, 608 (S.D.N.Y. 2013) ("When a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." (quotation marks, alteration, and citation omitted)); Legal Aid Society v. City of New York, 114 F. Supp. 2d 204, 224 (S.D.N.Y. 2000) ("The doctrine of law of the case . . . applies to issues explicitly resolved by the earlier decision as well as to those resolved by necessary implication." (internal quotation marks omitted)). Defendant has presented no intervening change in law that might affect the prior resolution of these claims, or any other compelling reason for the Court to reconsider them. See U.S. v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991) ("[T]his Court will adhere to its own prior rulings in a given case absent cogent or compelling reasons to deviate, such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." (internal quotation marks omitted)). Therefore, the Court declines to revisit its earlier ruling on this issue.

38

### III. Conclusion

For the reasons described above, Defendant's Motion to Dismiss is GRANTED in part and DENIED in part. The Motion is GRANTED with respect to Intervenors' implied certification claims based on the incentive payment provisions. The Motion is DENIED in all other respects. Defendant CSC is to answer the Amended Complaints within 20 days of the date of this Order.

SO ORDERED.

Dated: New York, NY
       August 10, 2017

Deborah A. Batts
United States District Judge