**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **VINCENT FORCIER; STATE OF NEW YORK** *ex rel.* **VINCENT FORCIER,** ) ) ) ) | **CIVIL ACTION NO.** |
| **Plaintiffs,** ) ) ) | _____ |
| **v.** ) ) | |
| **COMPUTER SCIENCES CORPORATION, INC.,** and **CITY OF NEW YORK,** ) ) ) ) | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)** |
| **Defendants.** ) ) | **JURY TRIAL DEMANDED** |

**COMPLAINT**
**(False Claims Act)**

**SUMMARY STATEMENT**

1.      This lawsuit involves a fraud of more than eighty million dollars ($80,000,000.00) on the federal-state Medicaid Program and other government health programs carried out by Defendant Computer Sciences Corporation, Inc. (CSC), in its role as fiscal agent for three different Early Intervention Programs (EIPs):  those of New York City, New Jersey and Indiana. CSC is a Fortune 500 company that provides information technology and financial services to industries world-wide, and serves as a fiscal agent for a number of Early Intervention Programs around the country.  The City of New York (NYC), acting through the Early Intervention Program run by its Department of Health & Mental Hygiene, has conspired with CSC and participated in the fraud against the New York State Medicaid Program and the New York State Early Intervention Program.

2.     Early Intervention Programs, which are established by states and cities to qualify for federal grant funding under Part C of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1431-1444, provide interventional therapy, such as occupational and physical therapy, and other services to developmentally-delayed children under the age of 3 and their families. The costs of therapy delivered as part of an Early Intervention Program often are reimbursed by third-party insurance such as employer health care plans, by Medicaid when the patient is eligible for Medicaid benefits, and/or by the State Early Intervention Program.

3.     Defendants NYC and CSC have fabricated patient diagnoses on claims in order to wrongfully obtain reimbursement from the New York State Medicaid program and the Early Intervention Program of the New York State Department of Health, both of which are funded by the federal government as well as the state government. The Medicaid Program and NY State's Early Intervention Program cover the costs of therapy only when medically necessary and provided to eligible recipients. Both programs rely on the claim's designation of patient diagnosis to determine medical necessity.

4.     Defendants NYC and CSC have also submitted false claims to and improperly retained overpayments received from New York's Medicaid Program and the state Early Intervention Program by billing those programs as if they were primary payers and then failing to disclose and refund reimbursements obtained from third-party insurers and providers.

5.      CSC, as fiscal agent for the Early Intervention Programs of the States of New Jersey and Indiana, has also submitted false claims to and improperly retained overpayments received from the federal-state Medicaid Program of those states by failing to disclose and refund to Medicaid reimbursements obtained from third-party insurers and providers. Moreover, CSC, as fiscal agent for the Early Intervention Program of Indiana, has improperly submitted

claims to the federally-funded "Temporary Assistance for Needy Families" program in violation of federal rules.

## JURISDICTION AND VENUE

6.     All Counts of this Complaint are civil actions by Relator, acting on behalf of and in the name of the United States and the State of New York, against the Defendants under the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and the New York False Claims Act, NY Finance Law, Art. 13, § 187 *et seq.*

7.     This Court has jurisdiction over the claims brought on behalf of the United States pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

8.     This Court has jurisdiction over the state law claims alleged herein under 31 U.S.C. § 3732(b).  In addition, the Court has supplemental jurisdiction over the claims brought on behalf of the State of New York under 28 U.S.C. § 1367.

9.     The False Claims Act provides that an action under 31 U.S.C. § 3730 may be brought "in any judicial district in which . . . any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."  31 U.S.C. § 3732(a).  The Defendants all transact business in this judicial district.

10.     None of the allegations set forth in this Complaint is based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media.  Relator Vince Forcier has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based.  Moreover, prior to filing this lawsuit and prior to any public disclosures regarding this matter, Relator voluntarily provided the

information set forth herein to agents of the United States Department of Justice and the State of New York.

11.     None of the allegations or transactions set forth in this Complaint is substantially the same as allegations or transactions that have been publicly disclosed in a Federal criminal, civil or administrative hearing in which the Government or its agent is a party, or in a congressional, administrative or Government Accountability Office, or other Federal report, hearing, audit or investigation, or from the news media.

## THE PARTIES

### Qui Tam Plaintiff Vincent Forcier

12.     Vincent Forcier ("Forcier" or "Relator") was born in Joplin, Missouri.   Forcier graduated from Baker University in December 1998 with a Master's Degree in Business Administration.  In December 1999, he was hired as a web developer for PDA, Inc., a company subsequently purchased by an entity that, in turn was purchased by CSC.  Forcier remained with PDA, Inc. when it was purchased by Covansys, Inc. in approximately 2002 or 2003.   He remained with Covansys, Inc. when it was purchased by CSC in approximately 2007 or 2008. He has been employed by CSC since that date.  He is currently a Senior Account Manager within the Early Intervention Group in the Business Process Outsourcing Division of CSC's Financial Services Group.  CSC's Financial Services Group is contained within CSC's Business Solutions & Service Sector.

13.     As a Senior Account Manager in the Early Intervention Group, Forcier manages the CSC account managers who interact with the government personnel who run the Early Intervention Programs of Georgia, Indiana, Louisiana, Missouri, New Jersey, New York City and West Virginia.    Since 2007, however, he has had minimal involvement with the NYC

Program.  He handles contractual matters, development of business requirements and responses to client concerns. Forcier reports to Jay Saunders, CSC's Product Director in charge of Early Intervention Programs.  Forcier coordinates his work with the following individuals who also report to Saunders:  Maurice ("Mo") Fanty, Early Intervention Team Technical Lead; Nicki Haas (formerly Nicki Duncan), Production Support Lead; Mikki Middleton, Accounting Manager; John Thompson, Project Director; Nadine Tyler, Early Intervention Manager - Indiana, West Virginia and fund recovery ("FR") processing.  Forcier supervises Mike Vogel, Senior Account Manager - NYC and Joyce Jackman, Account Manager for Louisiana and New Jersey.

### Plaintiff United States Of America

14.     Relator brings this action against CSC and NYC on behalf of the United States pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*.

15.     On behalf of the United States, Relator seeks recovery for damages to the federal-state Medicaid program, established under Title XIX of the Social Security Act, 42 U.S.C. §1396 *et seq.*, and state laws.

16.     The Centers for Medicare and Medicaid Services (CMS) of the U.S. Department of Health & Human Services (HHS) funds and oversees the joint federal-state funded Medicaid Program for the financially needy.  Federal law establishes the conditions for federal funding of state-run Medicaid programs.  For every state that is eligible under federal law for federal financial participation (FFP) in its Medicaid program, CMS uses federal taxpayer money to pay a set percentage of that state's Medicaid expenses.  Reimbursement for health care goods and services covered by a state Medicaid program is made first by each state's Medicaid program agency.  The state Medicaid agency, in turn, is reimbursed for a portion of its expenditures by the federal government.

**Plaintiff State of New York**

17.     Relator also brings this action against CSC (but not against NYC) under the *qui tam* provisions of the New York False Claims Act, NY Finance Law, Art. 13, § 187 *et seq.*  New York State's Department of Health, through its Bureau of Early Intervention, runs an Early Intervention Program established under Article 25 of the New York Public Health Law, NY CLS Pub Health § 2540 *et seq.*   This program is funded by New York State and the federal government.  New York State also pays claims submitted by providers under the New York State Medicaid Program.

18.     On behalf of New York State, Relator seeks recovery for damages caused by Defendant CSC to the New York State Early Intervention Program and the New York State Medicaid program.

**Defendant Computer Sciences Corporation, Inc.**

19.      Computer Sciences Corporation, Inc. is a Fortune 500 company that does business world-wide providing information technology and financial services and products to private businesses and the public sector.  CSC is incorporated in Nevada and headquartered in Falls Church, Virginia.  The company reports that it earned $16.2 billion in revenue during the twelve month period ending September 30, 2011.

20.     Through its Early Intervention Product group in its Business Process Outsourcing Division, CSC serves as fiscal agent for the Early Intervention Programs of Defendant New York City and a number of states, including, but not limited to, New Jersey and Indiana.  In this capacity, CSC pays clinicians and bills Medicaid and other health insurers for early intervention services that NYC and the states provide to children with developmental delays.  CSC's Early Intervention Product group is located in Overland Park, Kansas.   CSC acquired its Early Intervention Product

group through the purchase of Convasys, Inc., an entity that had only recently been suspended from government contracting in the State of Indiana and deemed an irresponsible contractor by New York City.

21.    The key CSC personnel in charge of CSC's work as fiscal agent for NYC and various state Early Intervention Programs are Maurice Fanty, Nicki Haas, Mikki Middleton, Jay Saunders, John Thompson, and Nadine Tyler.  Saunders is the most senior, holding the position of Product Director – Early Intervention Programs.  Fanty, Haas, Middleton, Thompson and Tyler all report to Saunders.  Fanty is CSC's Team Technical Lead, Early Intervention Programs; he oversees the development and maintenance of the software programs that CSC uses to perform its responsibilities as fiscal agent, managing the software engineers that do this work.  Haas is the lead for Production Support, meaning that she oversees the group that deploys software coding, monitors computer servers and otherwise manages the operational environment.  Middleton, as Accounting Manager, oversees the accounting for CSC's Early Intervention Program work.  Finally, Thompson, Project Director in charge of Early Intervention Programs, manages the software development projects prior to deployment.

22.    In managing CSC's work as fiscal agent for NYC and various state Early Intervention Programs, Saunders, Thompson and Haas have emphasized "getting the clients' claims paid" rather than compliance with the federal and state laws that govern billing of government health care programs.  They have time and again directed CSC's software engineers to program CSC's billing software in ways that result in overbilling of government health programs.

23.    Conversely, despite their knowledge of significant credit balances owed government health plans, they have avoided asking the software engineers to write program logic to identify overpayments and refund them to insurers.

- 7 -

**Defendant New York City**

24.     New York City (NYC), through its Department of Health & Mental Hygiene, acts as a health care provider arranging and billing for therapy for infants and toddlers it has accepted into its Early Intervention Program.  According to NYC, the major elements of this program are: identification and referral of children at risk or suspected of disability by primary referral sources; periodic developmental screening and tracking of at-risk children; service coordination services for eligible children and families; a multi-disciplinary evaluation, at no cost to the family, to determine eligibility; Individualized Family Service Plans (IFSPs) for eligible children and families; and provision of Early Intervention Services authorized in the IFSP at no cost to the family.

25.     After accepting children into its Early Intervention Program, NYC pays physical, speech and occupational therapists and other providers on the children's behalf, and seeks reimbursement on the children's behalf from third-party insurers (such as employer health plans), Medicaid and the New York State Early Intervention Program.  To handle the financial aspects of the program, such as paying providers, seeking reimbursement from insurers, and producing financial reports, NYC contracts with outside entities that serve as NYC's fiscal agent. Since 2006, pursuant to a contract between NYC and CSC, CSC has served as NYC's fiscal agent.

**STATUTORY BACKGROUND**

**The Individuals with Disabilities Education Act**

26**.**     Part C of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1431-44, provides federal funding for early intervention services delivered by states and local governments for children under three years of age with a developmental delay or other disability

likely to affect their ability to learn in school. The IDEA defines a "child with a disability" as a "child…with an intellectual disability, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance..., orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and, who... [because of the condition] needs special education and related services." 20 U.S.C. § 1401(3)(A).

27.     The IDEA provides that federal funding will be available only for those early intervention costs that Medicaid and other insurers do not cover.  In other words, IDEA is a secondary insurer to Medicaid and other insurers.  20 U.S.C. § 1440.  The States of New York, New Jersey and Indiana -- whose programs are at issue in this lawsuit -- likewise specify that state financing of the costs of Early Intervention Programs is available only when Medicaid doesn't pay.  NY CLS Pub. Health § 2557; NJAC 8:17-9.5 (2012); 470 IAC 3.1-12-1 (2011).

28.     Under the rules of the New York State Early Intervention Program, whenever a municipality receives reimbursement from Medicaid after the state has paid for a service, the municipality must reimburse the state. Guidance on Claiming Commercial Insurance for Early Intervention Services, EIP Memorandum 2003-2 (available at http://www.health.ny.gov community/infants_children/early_intervention/memo03-2.htm#_toc42408106) (accessed on March 2, 2012).

29.     To be eligible to receive federal funds under the IDEA, a state must have a "rigorous definition of the term 'developmental delay.'" 20 U.S.C. § 1435.  In the State of New York, a child is eligible for the state's Early Intervention Program only if he or she meets very specific criteria pertaining to the nature of his or her developmental delay.  *See* 10 NYCRR 69-4.23.

## The Medicaid Program

30.     The Centers for Medicare and Medicaid Services (CMS) of the U.S. Department of Health & Human Services (HHS) funds and oversees the joint federal-state funded Medicaid Program for the financially needy, established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, and state laws.  Reimbursement for health care covered by a state Medicaid program is made by each state's Medicaid program agency, which, in turn, seeks reimbursement for a portion of its expenditures from the federal government.

31.     Pursuant to federal law, state Medicaid programs receiving federal funds must, for individuals under the age of 21, cover the costs of screening and diagnosis "to ascertain physical and mental defects, and providing treatment to correct or ameliorate defects and chronic conditions found."  42 C.F.R. § 441.50.  This benefit, termed the "Early and Periodic Screening, Diagnosis and Treatment (EPSDT) of Individuals Under Age 21," covers medically necessary physical, speech, auditory and occupational therapy services, among other treatments.  Children participating in Early Intervention Programs who are eligible for Medicaid often seek coverage under this benefit.

## Medicaid's Medical Necessity Requirement

32.     Federal Medicaid law and regulations require that any health care provider who furnishes health care services that may be reimbursed under Medicaid must ensure that, to the extent of his or her authority, those services are provided "only when, and to the extent, medically necessary" and are "supported by evidence of medical necessity."  42 U.S.C.A. § 1320c-5(a); 42 C.F.R. § 1004.10.

33.     Companies that bill on behalf of health care providers, including fiscal agents for states and municipalities, must enact policies and procedures that "indicate that the diagnosis and

procedures reported on the reimbursement claim should be based on the medical record and other documentation." *OIG Compliance Program Guidance for Third-Party Medical Billing Companies*, 63 Fed. Reg. 70138, at 70144 (Dec. 18, 1988).  Moreover, "claims should be submitted only when appropriate documentation supports the claims and only when such documentation is maintained, appropriately organized in legible form and available for audit or review." *Id*.

34.     New York State's Medicaid Statute provides that Medicaid only covers "medically necessary and appropriate services."  18 N.Y.C.R.R. 500.1(b).  Municipalities billing New York's Medicaid Program for early intervention services are specifically required to include on the claim form the "ICD diagnostic code for the conditions or reasons for which care was provided."  10 NYCRR § 69-4.26.

35.     Before health care providers may bill New York Medicaid, they must agree in writing: i) to submit claims only for services that are "medically necessary or otherwise authorized under the Social Services Law when furnished and which were provided to eligible persons"; ii) "that the information provided in relation to any claim for payment shall be true, accurate and complete"; and, iii) "to comply with the rules, regulations and official directives of the department."  18 N.Y.C.R.R. 504.3(e), (h) and (i).

**Medicaid as Payer of Last Resort**

36.     Federal law provides that Medicaid is to be the payer of last resort, and requires states receiving federal financial participation to undertake a number of steps to ensure that Medicaid doesn't pay claims for which third parties are liable.  42 C.F.R. 1396(a)(25);  42 C.F.R. §§ 433.137 – 433.139.

37.     The Medicaid Programs of New York, New Jersey and Indiana all provide that

- 11 -

third-party insurers are liable before Medicaid and that Medicaid is the payer of last resort. *See, e.g.,* 405 IAC 1-13(f); NJAC § 10.49-7.3(b), (c), (e) and (i) (2012); 18 N.Y.C.R.R. 540.6(e)(4).

**Providers Must Reimburse Medicaid for Overpayments**

38.     Under federal Medicaid law, when a provider identifies *any* overpayment from Medicaid, the provider must report and return the overpayment to Medicaid by the later of 60 days after it identified the overpayment, or, if the provider submits cost reports, when the next cost report is due.  42 U.S.C. § 1320a-7k(d).  Federal Medicaid law defines an "overpayment" as "any funds . . . to which the person, after applicable reconciliation, is not entitled under such title." 42 U.S.C. § 1320a-7k(d)(4).   Any overpayments retained after these statutory deadlines are deemed "obligations" within the meaning of 31 U.S.C. § 3729(a)(1)(G) , the provision in the federal False Claims Act which imposes liability on those who knowingly and improperly avoid an obligation to pay funds to the Government. 42 U.S.C. § 1320a-7k(d)(3). Likewise, the Medicaid rules of Indiana, New Jersey and New York require providers to promptly refund money to the state Medicaid agency when they identify overpayments.  405 IAC 1-1-6(b)(10)(B) (2011); Indiana Health Coverage Programs Provider Agreement, Par. 19, (available atwww.indianamedicaid.com/ihcp/providerservices/pdf/provider  agreement.pdf) (accessed on Feb. 29, 2012) (requiring repayment within 15 days);  NJAC § 10:49-8.3(a) (2012) (requiring repayment within 60 days); 18 N.Y.C.R.R. 540.6(e)(4) (requiring repayment within 30 days**).**

**States Must Reimburse the Federal Government for Medicaid Overpayments**

39.     When a provider returns an overpayment to a state Medicaid Program, the state is obligated to refund to the federal government that portion of the overpayment that equals the amount of federal financial participation in the original payment on the claim.  42 C.F.R. § 422.312.

**THE FRAUDULENT SCHEMES**

**Fraud by New York City's Early Intervention Program & CSC**

**Background**

40.     NYC operates an Early Intervention Program through its Department of Health & Mental Hygiene.  NYC uses a combination of federal, state and local funds -- 50% city funds and 50% state and federal funds -- that is allotted for the Early Intervention Program to pay providers; then, when third-party insurance or government health program insurance, such as Medicare or Medicaid, is available, NYC seeks reimbursement from the insurers.

41.     Pursuant to Request for Proposal (RFP) PIN 05EI26000R0X00, NYC in 2005 requested bids by companies interested in serving as NYC's fiscal agent for its Early Intervention Program.  NYC accepted the proposal that CSC submitted in response to this RFP, awarding CSC a contract, effective on a date in or about 2006, to serve as its fiscal agent in the administration of the New York City Early Intervention Program.  The initial term of the contract was five years, with up to two renewals of two years each possible at the option of the parties. CSC successfully negotiated an initial two year extension of the contract, and is currently negotiating a second two year extension of the contract.

42.     As stated in the RFP, CSC's responsibilities under this contract include: processing provider payments; claim reimbursement; financial reporting; record keeping; and, data collection for the Early Intervention Program.  Among other things, CSC must provide "toll-free telephone assistance for providers" and "create and maintain a provider manual and liaison staff to provide technical assistance regarding billing issues."   CSC must also "resolve any and all problems that may impact reimbursement from Medicaid, private insurers, and State Aid." The contract expressly states that CSC must perform all work in conformity with all applicable

federal, state and NYC laws.  CSC continues to serve as NYC's fiscal agent under the terms of this contract.

43.     Through the current time, NYC has used a database called "Kids Integrated Data System" (KIDS) developed by the New York State Department of Health to track the services provided to children accepted into NYC's Early Intervention Program.  This database contains information that identifies the children, such as name, gender and date of birth.  In the past, it has also contained a diagnosis for the child**.**  NYC makes this database available to CSC.

44.     Under its contract with NYC, CSC must develop and maintain a data repository that includes the fiscal and clinical data obtained from providers for billing purposes and the clinical data obtained from NYC's KIDS database.  CSC must provide NYC with access to this data repository.

45.     As part of its work for the NYC Early Intervention Program, CSC has developed and maintains a table called the Participant table.   This table sets forth basic identifying information for each child participating in the program, such as:  first name, middle initial and last name; date of birth; gender; race; an identification number assigned by the NYC Early Intervention Program; any Medicaid Identification Number provided by NYC; school district; and a "participant identification number" assigned automatically by CSC to each child in the program. CSC obtains all of the data included in this table from NYC, with the exception of the participant identification number, which CSC assigns.

46.     As part of its work for the NYC Early Intervention Program, CSC also has developed and maintains a table called the Diagnosis table.  This table contains information only on those children participating in the program for whom the NYC Early Intervention Program has assigned a diagnosis.  The children included in this table are a subset of the children included

in the Participant table. The fields that are filled in on this Diagnosis table include: the identification number of the entry; the child's CSC-assigned participant identification number; the diagnosis assigned by NYC; the start date of the child's diagnosis; the end date of the child's diagnosis; the prime indication of the diagnosis; and any description of the diagnosis entered by the program. With the exception of the participant identification number, the data in the table is provided to CSC by NYC.

47.    In or about 2008, NYC stopped providing CSC with diagnoses for any of the children it had accepted into the program.

48.    CSC tracks work assignments relating to modifications to the software program that it uses as fiscal agent for NYC's Early Intervention Program through a reporting system called JIRA tickets. CSC also uses this reporting system to track work on other sorts of non-software related projects and on other programs besides NYC's Early Intervention Program. JIRA tickets relating to work on particular programs are numbered sequentially, with each ticket that relates to work on the NYC EIP beginning with the letters "NYC."

**Fabrication of Diagnoses on Claims to Medicaid**

49.    When CSC, acting on behalf of NYC, submits a claim for reimbursement to third-party insurance, Medicaid or the State Department of Health, it is required to state on the claim form the diagnosis of the child receiving health care services. The rules of New York's Medicaid program set forth above require that the diagnosis stated on the claim form be supported by documentation in the provider's files.

50.    Until a point in approximately 2009, if NYC inputted a diagnosis for a child into the KIDS database, then CSC would use this diagnosis for billing purposes and include this diagnosis on the claim forms submitted to third-party insurers, Medicaid and/or the New York

State Department of Health.  CSC did so even when the therapists or other clinicians treating the child had submitted claims to NYC with different diagnoses.

51.     Many of the diagnoses that NYC inputted into the KIDS database were fabricated. On multiple occasions in or about April 2007, Relator heard senior level officials in charge of NYC's Early Intervention Program express their concern or shock at the inadequate documentation in NYC's files concerning the participants in the program and the early intervention services they were receiving.  In particular, he recalls comments to this effect by: Lewis Rosen, Director of NYC's EIP; Bruce Schiller, Director of Business Operations for NYC's EIP; and Verna Shelden, who coordinated the data entry group for NYC's EIP.    Relator specifically recalls Ms. Shelden joking about the awful state of the documentation.  Relator specifically recalls these officials referencing problems with documentation relating to diagnoses, demographic information and individualized family service plans.

52.     In addition, several aspects of the Diagnosis table are unsupportable.  For example, NYC has provided the diagnosis of ICD-9 Code 315.90 for the overwhelming majority of the children listed on the table (223,610 of 252,176 children, or 88%).  ICD-9 Code 315.9 is the code to describe a child with "disabilities originating before age 18 that constitute substantial barriers to normal functioning," such as "conditions characterized by a significant discrepancy between an individual's perceived level of intellect and their ability to acquire new language and other cognitive skills; may result from organic or psychological conditions."  It is improbable that so many children would have received an identical diagnosis of 315.9 (or 315.90, which is an invalid code) upon initial evaluation, particularly given the frequent use of other diagnosis codes on the claims that CSC receives directly from  the clinicians who provide therapy and other services to the children.  Moreover, the table contains numerous diagnosis "start" dates for

children that are earlier than the birthdates of the children set forth on the Participant Table described above.  The unsupportable nature of both the diagnoses codes and the diagnoses start dates indicates that NYC has fabricated both, in light of missing or inadequate documentation.

53.     Until approximately a point in 2009, in those instances in which there was no diagnosis for a child in the KIDS database, CSC automatically would assign the diagnosis of 315.9 to the child and would include this diagnosis code on the claim form submitted to insurers. CSC would do so even if the diagnosis on the clinician's claim to CSC was different.  For much of this time, providers did not even have an option to state a diagnosis on the claim form they submitted to CSC.

54.     Relator has identified 1,428 claims that CSC, acting as fiscal agent for NYC, submitted to Medicaid in 2007, the first year in which CSC processed payment and reimbursement claims on behalf of NYC, that list a diagnosis of 3159 (the billing version of diagnosis 315.9) without any supporting documentation.  In each of these cases, the KIDS database contains no diagnosis for the child, and the clinician's claim form lists a different diagnosis or no diagnosis at all.  These 1,428 claims do not include instances in which CSC did no more than change the placement of the decimal point or remove an ending zero from the code submitted by the clinician.  In each of the 1,428 instances, the code that the provider had submitted to CSC was substantively different from 315.9/3159.   New York's Medicaid Program reimbursed NYC $60,059.75 for these claims.

55.     The scope of the fraud grew dramatically in 2008.  Relator has identified 66,694 claims that CSC, on behalf of NYC, submitted to Medicaid in 2008 that list a diagnosis of 315.9 without any supporting documentation.  In each of these cases, the KIDS database contains no diagnosis for the child, and the clinician's claim form lists a different diagnosis or no diagnosis

at all.  These 66,694 claims do not include instances in which CSC did no more than change the placement of the decimal point or remove an ending zero from the code submitted by the clinician.  In each of the 66,694 instances, the code that the provider had submitted to CSC was substantively different from 315.9/3159.  In 37,334 of the instances, CSC's data showed that the provider had submitted no diagnosis at all.  Medicaid reimbursed NYC $4,492,309.70 for these claims.

56.     On January 7, 2009, in a JIRA ticket report identified as NYC 1755, Meera Rao, a former CSC employee who was at the time a CSC Quality Assurance employee, identified the following software problem:  "Diagnosis Code value should be from the ProviderClaim Line table and not from the Diagnosis table."  The reference to the "ProviderClaim Line" was a reference to the diagnosis submitted on the claim by the clinician treating the child, such as a therapist, for which CSC was seeking reimbursement from insurers.  By January 9, 2009, CSC's software engineers successfully had modified the program logic as requested and tested the change.

57.     Two days after opening the NYC 1755 ticket report, however, Maurice Fanty, who was at the time CSC's Software Development Lead, opened up another ticket report, NYC 1766, noting the need to "Update Rule 68 to default 315.9 in for ICD 9 codes if non numeric or length is less than 3."  In other words, when a clinical provider had submitted an invalid diagnosis code, instead of contacting the provider for clarification, CSC, on behalf of NYC, was deciding to assign a default diagnosis on its own initiative.  By January 12, 2009, CSC had implemented and tested this change to the software logic.

58.     On April 14, 2009, John Thompson, who was then a CSC Project Manager, sent an e-mail to Michael D. Vogel**,** CSC Senior Account Manager, NYC**,** with a copy to Jay L.

Saunders, CSC's Product Director, EIP.  This e-mail discussed another problem with many of the diagnoses that clinical providers were assigning to children in the program: even when the providers were using certain diagnosis codes that were valid (*i.e.*, the codes were included in the current, official listing of ICD-9 codes utilized by insurers for reimbursement purposes), Medicaid sometimes would reject the diagnosis as a basis for payment of the particular services provided to the child.  Thompson noted that he believed that "FH," *i.e.*, First Health, the prior fiscal agent for the NYC Early Intervention Program, "only submitted code 315.9" and he opined that NYC should seek clarification from Medicaid as to which diagnosis codes would result in Medicaid paying the claims.  Thompson suggested:  "Once we identify a set of ICD-9 codes and Revenue Codes that Medicaid will consistently pay, we can quickly code modifications to the application."  Thompson noted that, after these modifications, CSC would be able to resubmit a backlog of 900,000 denied claims that had been rejected by Medicaid because of the child's diagnosis or the revenue code on the claim.  Thompson further stated in the e-mail: "If Medicaid continues to treat these ICD-9's inconsistently, NYC EIP may prefer to return to the default 3159 code for all claims."

59.    In the next several weeks, CSC officials decided to program the CSC billing software with logic that would insert 3159 as a default diagnosis code whenever the health care provider had billed NYC using a diagnosis code that didn't reliably result in Medicaid payment of early intervention services.  In other words, even if the diagnosis code on the clinician's claim to NYC was a valid code (*i.e.*, found in the current, official listing of ICD-9 codes), if Medicaid would not always cover early intervention services when children had been assigned that diagnosis, then CSC would not use the code when billing Medicaid but instead would use the diagnosis code 315.9 -- a code that almost always resulted in Medicaid payment of early

- 19 -

intervention services.  As CSC Production Support Lead Nicki Haas admitted two years later in JIRA ticket NYC 4612:  "we determined to default the values to 3159 so claims would pay."

60.    On April 17, 2009, CSC opened two new JIRA tickets, NYC 2046 and 2047, to deal with a separate problem.  These tickets dealt with the question of what steps CSC should take when an insurer denied a claim due to an invalid ICD 9 code (*i.e.*, a code not found in the current, official listing of ICD-9 codes utilized by insurers).   Once again, rather than contact the clinician for clarification, CSC took it upon itself to assign 3159 -- the diagnosis that it knew would pay.  In NYC 2047, Maurice Fanty directed the software engineers to: "Create New Rule to look for valid ICD9 codes, or substitute 3159 code."  In NYC 2046, apparently referring to the decision to bill using only those ICD-9 codes that Medicaid regularly paid, Meera Rao noted that "[t]here will be one additional rule (written in another issue) for seeing if the ICD9 Code is one of the valid codes to be sent."

61.    CSC's program engineers wrote program logic, contained within Technical Rule 68, that defaulted the diagnosis code on the claim to Medicaid and other insurers to 3159 in two different circumstances:  i) if the diagnosis code on the clinician's claim was an invalid code, or ii) if the diagnosis code on the clinician's claim was a valid code that might result in non-payment.   The    following    CSC    documents    reflect    this    logic:   NYC-Database-SetDefaultICD9Codes-01162012.doc and NYC-TechSpec-Rule 68-Default_ICD9.doc.

62.    The scope of the fraud grew threefold between 2008 and 2009.  Relator has identified 193,664 claims that CSC, as fiscal agent for NYC, submitted to Medicaid in 2009 that list a diagnosis of 315.9 without any supporting documentation.  In each of these cases, the KIDS database contains no diagnosis for the child and the clinician's claim form lists a different diagnosis or no diagnosis at all.  Once again, the claims Relator has identified do not include

instances in which CSC did no more than change the placement of the decimal point or remove an ending zero from the code submitted by the clinician.  In each of the 193,664 instances, the code that the provider had submitted to CSC was substantively different from 315.9/3159.  New York's Medicaid Program reimbursed NYC $13,888,016.44 for these claims.

63.     Relator has identified 363,691 claims that CSC, as fiscal agent for NYC, submitted to Medicaid in 2010 that list a diagnosis of 315.9 without any supporting documentation.   In each of these cases, the KIDS database contains no diagnosis for the child and the clinician's claim form lists a different diagnosis or no diagnosis at all.  Again, these claims do not include instances in which CSC did no more than change the placement of the decimal point or remove an ending zero from the code submitted by the clinician.  In each of these instances, the code that the provider had submitted to CSC was substantively different from 315.9/3159.  New York's Medicaid Program reimbursed NYC $26,771,494.64 for these claims.

64.     Relator has identified 330,039 claims that CSC, as fiscal agent for NYC, submitted to Medicaid in 2011 that list a diagnosis of 315.9 without any supporting documentation.  In each of these cases, the KIDS database contains no diagnosis for the child and the clinician's claim form lists a substantively different diagnosis or no diagnosis at all.  New York's Medicaid Program reimbursed NYC $25,460,170.49 for these claims.

65.     In or about May 2011, Defendants CSC and NYC discussed the fact that clinicians were using diagnosis codes on claims that Medicaid didn't accept as a valid basis for payment.   Ron Huber of NYC's Department of Health & Mental Hygiene asked CSC to provide NYC with a report of all instances in which CSC had used the default billing code 3159 so NYC could determine which provider agencies were using codes that CSC had to change.  In JIRA ticket NYC 4612, CSC addressed NYC's request for an "Ad Hoc Summary of Claims by Agency

Where CSC Used Default ICD 9/CPT Code to Populate the Medicaid and Private Carrier Claims." This JIRA ticket expressly references Huber's statement that NYC planned to use the information to identify the providers "who are submitting incorrect codes."

66. On June 30, 2011, CSC opened JIRA ticket NYC 4762 to address new business requirements that required, *inter alia*, that "[t]he system shall remove the existing logic to default the ICD-9 code if the provided ICD-9 code is not valid or results in non-payment." Instead of using 3159 as a default code, CSC now would use the code submitted by the clinician on its claim. On July 12, 2011, this report was updated to note that the effective date of this change would be August 1, 2011: "[r]ules are changed to update claims with service date less than 08/01/2011 with default CPT and ICD 9 Code Values. Claims with service Date greater than 08/01/2011 will use the CPT and ICD9 Code in the Provider Claim Line Table." The report indicates that these changes were deployed in August 2011.

67. Notwithstanding the entries in the NYC 4762 ticket indicating that the system's logic was changed so that CSC would bill using the diagnosis code on the clinician claim going forward, CSC has continued to use program logic that substitutes diagnosis code 315.9 on claims to Medicaid when the clinician's diagnosis code does not appear on CSC's internal table of "valid" ICD-9 claims that result in payment. Thus, on January 24, 2012, CSC's then Production Support Lead Nicki Haas and CSC Project Director, Early Intervention Programs, John Thompson communicated by e-mail about the fact that CSC's table of "valid" codes needed to be updated because claims with some of the codes on the table were now being rejected by Medicaid. Haas reminded Thompson that: "In NYC, the provider keys an ICD9 code on the claim and if it's a code that exists on our ICD9Code table, then we send it to Medicaid. If it's on [sic] on the table, then we send 315.9." Haas noted that the updating of the internal CSC table

should not only delete some codes that now were being rejected by Medicaid, but also add any new codes that were now being paid by Medicaid. Haas stated in the January 24, 2012 e-mail communications: "I think we may have to add the new ones (if any) too. Otherwise, some valid codes may get shouldered aside by a 315.9. That's probably a secondary concern, though."

68.     Indeed, CSC's internal data repository of claims confirms that CSC continued, after August 2011, to engage in the unlawful practice of falsifying diagnosis codes on claims submitted to Medicaid and other insurers. Thus, between September 1, 2011 and December 31, 2011, CSC billed Medicaid <u>42,064 times</u> using default code 315.9 in circumstances in which the clinician's claim diagnosed the child differently (using a different code) and no diagnosis whatsoever had been provided to CSC by NYC.

69.     In assigning diagnoses on its own, CSC, as fiscal agent for NYC, and with NYC's knowledge and consent, has fabricated diagnoses. CSC has had no access to the clinical records of the child and, accordingly, has not reviewed those records; moreover, even if it had access to the patient charts, CSC lacks both the legal authority and the credentials to assign medical diagnoses. It is a fiscal agent, not a clinician.

70.     NYC and CSC have neither reported to Medicaid nor repaid it for the approximately $70 million in Medicaid claims previously submitted with a default diagnosis code that differed from the diagnosis for the child contained in NYC's files.

71.     The following are 14 examples of the hundreds of thousands of claims that NYC and CSC submitted to Medicaid with a falsified patient diagnosis of 3159 between January 1, 2007 and December 31, 2011:

| Date of Service | CSC Claim No. | Medicaid Pd. | Clinician Diagnosis |
|---|---|---|---|
| 06/16/2011 | 93404428-1 | $ 19 | None |
| 06/17/2011 | 93404442-2 | $ 19 | None |
| 06/13/2011 | 93404443-2 | $ 19 | None |
| 06/17/2011 | 93404448-3 | $ 19 | None |
| 02/21/2011 | 91754059-15 | $114 | 299.8 |
| 01/03/2011 | 91747108-1 | $125 | 299.8 |
| 01/13/2011 | 91747108-8 | $125 | 299.8 |
| 01/20/2011 | 91750131-12 | $125 | 299.8 |
| 09/13/2011 | 94463376-1 | $114 | 299.8 |
| 12/02/2011 | 95308109-2 | $114 | 299.8 |
| 09/15/2011 | 94711901-10 | $ 63 | 265.23 |
| 11/30/2011 | 95307911-1 | $ 81 | 765.1 |
| 09/19/2011 | 94627548-12 | $ 81 | 742.20 |
| 01/06/2011 | 91185648-1 | $214 | 389.5 |

Diagnosis Code 299.8 stands for "other specified pervasive developmental disorders."  The 2012 ICD-9 publication describes this diagnosis code as appropriate for someone with a "neuropsychiatric disorder whose major manifestation is an inability to interact socially; other features include poor verbal and motor skills, single mindedness, and social withdrawal."  The diagnosis involves a"[s]yndrome or disorder usually first diagnosed in childhood, characterized by severe and sustained impairment in social interactions and restricted, repetitive patterns of behaviors, interests, and activities."  Diagnosis 265.23 does not appear to be a valid code, but it is closest numerically to diagnosis 265.2, which is the thiamine and niacine nutritional deficiency

Pellagra.  Diagnosis 765.1 refers to a preterm infant weighing between 1,000 and 2,499 grams (*i.e.*, between 2.3 and 5.8 lbs).  Diagnosis 742.20 likewise does not appear to be a valid code, but the closest code numerically – 742.2 – refers to reduction deformities of the brain.  Diagnosis 389.05 is a unilateral hearing loss (*i.e.,* hearing loss in one ear).

### False Claims Submitted to and Failure to Disclose and Refund Credit Balances Owed to Medicaid and the NY Department of Health

72.     Through at least September 2011, CSC had not deployed software logic to disclose or refund overpayments made by Medicaid and the State Department of Health.

73.     For each and every year in which CSC has served as fiscal agent for NYC, NYC's Early Intervention Program has accumulated significant credit balances on claims, *i.e.*, NYC has obtained more reimbursement from insurers than it has paid providers.  NYC and CSC are aware of these significant credit balances.  Pursuant to its contract with NYC, CSC carefully tracks the status of all claims it submits for reimbursement, monitoring the total payments received from insurers and the total payment to the provider on each claim.  CSC provides NYC with summary and detailed financial reports on claims.  These reports show significant credit balances on claims, *i.e.,* greater amounts received as reimbursement than paid out, because insurers over the years have paid significantly more than NYC, through CSC, has paid the providers.  Rather than disclosing and refunding these credit balances to insurers, however, NYC and CSC have simply left them in NYC's bank account.

74.     In the first five years in which it served as fiscal agent for NYC, CSC accumulated the following credit balances on its books and records:

   For Claims with Dates of Service in 2006: $113,342

   For Claims with Dates of Service in 2007: $520,328.20

   For Claims with Dates of Service in 2008: $1,273,553.49

   For Claims with Dates of Service in 2009: $520,426.40

   For Claims with Dates of Service in 2010: $311,761.91

75.     NYC's annual credit balance skyrocketed in 2011.  In 2009 and 2010, CSC's software engineers worked on developing program logic to submit claims to Medicaid even if they had already been submitted to the State Department of Health if new information indicated that the child was Medicaid eligible.  This work is reflected in JIRA work tickets NYC 2648, NYC 2868, NYC 3479 and NYC 3487.  On a parallel track, in 2009 and 2010, the engineers worked on writing software code to submit claims to Medicaid when claims to third-party insurance were pending, and to submit claims to third-party insurers even when they had already been submitted to Medicaid if new information showed that the child was covered by a third-party insurer.  This work is reflected in JIRA work tickets NYC 2653 and NYC 2833.  Even though it could easily foresee that this new program logic would lead to duplicative payments on claims, CSC continued to avoid writing software code that would adjust claims paid in full by both third-party insurance and Medicaid, or by both Medicaid and the State Department of Health.  CSC continued to avoid its obligation to make refunds to the insurer that was secondary.

76.     CSC was fully aware that, as a result of its billing system, Medicaid was overpaying claims. In 2010, JIRA work tickets identified several problems with CSC's billing software.   Thus, NYC 3125 noted that several "informational claims" sent to the State

Department of Health (*i.e.*, claims that informed the state as to the payments received on the claim without asking the state for payments) had shown full payment by <u>both</u> Medicaid and third-party insurance.   Later in the year, NYC 3692 noted that the billing system was resubmitting claims to <u>both</u> Medicaid and third-party insurance in the same run.

77.   For claims with dates of service between January 1, 2011 and September 28, 2011, CSC is carrying credit balances of $4,279,887.80.

78.    In total, for claims with dates of service prior to September 28, 2011, NYC is carrying approximately $7,019,280 in credit balances owed Medicaid and the State Department of Health.   This $7 million in credit balances reflect overpayments on approximately 863,935 claims: 1,505 with dates of service in 2006; 9,430 with dates of service in 2007; 31,144 with dates of service in 2008; 13,538 with dates of service in 2009; 6,721 with dates of service in 2010; and 801,597 with dates of service between January 1 and September 28, 2011.

79.   Examples of the 863,935 claims with credit balances include the following:

| CSC Claim # | .D/O/S | Provider Pd. | 3rd Party Pd. | Medicaid Pd. | DOH Paid |
|---|---|---|---|---|---|
| 91617308 | 02/07/2011 | $514 | $150 | $514 | 0 |
| 92569244 | 04/28/2011 | 0 | 0 | $152 | 0 |
| 76000272-1 | 05/29/2008 | $494 | $300 | 0 | $242.06 |
| 7794586-1 | 10/10/2008 | $494 | 0 | $494 | $197.96 |

80.   In billing multiple payers for the same claim with knowledge that its computer system had no means to automatically report and refund overpayments, CSC, as fiscal agent for NYC, knowingly submitted false claims to Medicaid and the State Department of Health.   In addition, in failing to report and refund the resulting overpayments by New York State's

Medicaid Program and the State Department of Health, NYC and CSC have avoided repayment obligations imposed by both federal and state law.

**Switching Gender and Place of Service so That Insurance Will Pay**

81.     In overseeing and administering the fiscal aspects of the NYC Early Development Program, NYC and CSC officials have acted with reckless disregard for Medicaid's documentation requirements, the accuracy of the information on the claims they have submitted to Medicaid and other insurers, and requirements to refund overpayments.  In the case of the default diagnosis and credit balance frauds set forth above, NYC and CSC's disregard for the rules have inflicted significant financial damage on Medicaid and the New York State Department of Health.  While other NYC and CSC schemes did not inflict the same level of damage, they demonstrate NYC and CSC's cavalier attitude with regard to the accuracy of the factual information set forth on claims.

82.     For example, beginning in or about August 2010, CSC automatically changed the child's gender on claims submitted for approximately 1,324 children in response to Medicaid's denial of prior claims on the ground that the gender of the beneficiary indicated on CSC's claim did not match the gender in Medicaid's records.  CSC flipped the gender without regard to whether the new gender conflicted with the gender listed in NYC's KIDS database at the time or the actual gender of the participant.  CSC wrote program logic to submit all future claims for the beneficiary using the opposite gender from the one that had led to the claim's rejection.  CSC's actions are documented in JIRA tickets NYC 3703, 3704, 3711, 3797, 4441 and 4405.

83.     CSC also has written programming code that uses default "place of service" codes on claims, with the default codes varying according to the insurer.  In a CSC document called "Update FRrule77 (spFRSetFacilityCode) to set the Facility Code on Medicaid Claims to 11, 12

or 99," CSC officials direct CSC software programmers on what to do to implement this scheme. When Medicaid is billed, CSC uses one of three codes for place of service that correspond with the child's natural environment; providing services in the child's home or other natural environment is one of the federal criteria for financing of an EIP.  However, when third-party insurers are billed, CSC uses different default codes because, by contrast to the federal criteria, third-party insurers will not pay more than a certain percentage of services for a given beneficiary in the home setting.  Relator's understanding is that the EIP providers ordinarily do provide services in the home, so, most of the time, NYC and CSC's claims to Medicaid will correctly state the place of service.  The same is not true with regard to their claims to third-party insurers, however.

**Fraud by CSC as Fiscal Agent for New Jersey's Early Intervention Program**

**Background**

84.    CSC also serves as fiscal agent for the State of New Jersey's Early Intervention Program.  In response to CSC's bid on NJ Bid Reference Number = 04-X-36179, T-Number = T2211, New Jersey awarded CSC a contract in 2004 to process provider claims and reimbursement requests and handle other fiscal matters for New Jersey's Early Intervention Program.

85.    The New Jersey Early Intervention Program pays providers delivering therapy and other services and then seeks reimbursement from Medicaid if the child is a Medicaid beneficiary.  (The clinicians rather than CSC seek reimbursement from liable third-party insurers.)

**False Claims and Failure to Disclose and Refund Credit Balances Owed Medicaid**

86.     CSC has not programmed the software that it uses to perform its contract as fiscal agent for New Jersey to automatically report or refund overpayments to Medicaid.

87.     During the period of time that CSC has served as fiscal agent for the New Jersey Early Intervention Program, the New Jersey Early Intervention Program has accumulated more than $2.8 million in credit balances.  These credit balances are a result of CSC seeking and obtaining Medicaid payment for services for which New Jersey paid the providers nothing.  Relator's review of claims with dates of service between May 1, 2004 and September 13, 2011 has identified 10,275 claims in this category.  The following are examples:

| Claim No. | Medicaid Paid | Provider Paid | Date of Service |
|-----------|---------------|---------------|-----------------|
| 173057-1  | $255.07       | 0             | 05/01/2009      |
| 526837-4  | $264.94       | 0             | 03/10/2006      |
| 2282000-4 | $294.54       | 0             | 07/23/2009      |
| 3625169-2 | $299.43       | 0             | 09/13/2011      |

**Fraud by CSC as Fiscal Agent for Indiana's Early Intervention Program**

**Background**

88.     Since 1997 -- with an interruption between 2006 and 2008 when Covansys, Inc. was suspended from government contracting in Indiana due to ethics issues (and also deemed an irresponsible contractor by NYC) -- CSC's Early Intervention Group and its corporate predecessors (PDA, Inc. and Covansys, Inc.) have served as fiscal agent for Indiana's Early Intervention Program, referred to as "First Steps."  CSC is currently serving as fiscal agents pursuant to Contract No. GA06-9-99-09-QR-0255, awarded to CSC by Indiana's Family & Social Services Administration.

89.     Indiana must bill several different funding sources for early intervention services before using federal and state funds made available for the Early Intervention Program. 470 IAC 3.1-12-11.  Pursuant to federal and state law, these funding sources include, in order of liability for payment of claims: i) third-party insurers, ii) Medicaid, and iii) for those children not on Medicaid, parents, who pay co-pays.  Only after these funding sources have been exhausted, may Indiana, under federal and state law, use the federal, state and local funding designated for the Early Intervention Program to pay any remaining costs.  20 U.S.C. § 1440; 470 IAC 3.1-12-1 (2011).

90.     Pursuant to its state plan, Indiana utilizes federal funds made available through the federal Temporary Assistance for Needy Families (TANF) block grant program to pay the costs of some of the benefits provided to children and their families under its "First Steps" Early Intervention Program.  To use federal TANF funds for these purposes, Indiana turns the TANF funds over to the state officials administering the First Steps program.  *See, e.g.*, *Indiana's State Plan for Temporary Assistance to Needy Families Block Grant, October 1, 2010 – December 31, 2012,* (available at http://www.in.gov/fssa/files/IN_tANF-state_thePlan-Amendment_Feb_ 2012.pdf) (accessed on March 7, 2012).  Federal law contains several important restrictions on the use of this federal TANF money, however.

91.     First, pursuant to federal law, the federal TANF funds are not available to pay medical expenses.  42 U.S.C. § 608(a)(6);  *Helping Families Achieve Self Sufficiency – A Guide on Funding Services for Children and Families through the TANF Program,* U.S. Department of Health & Human Services, Administration for Children & Families, Office of Family Assistance (Dec. 21, 1999) at 16.

92.     Second, the federal TANF funds transferred to the EIP Program are also subject to the restrictions on use of federal funds that govern that program, including the rule that the EIP Program is a payer of last resort, paying only after third-party insurance and Medicaid benefits have been exhausted.   When a state turns federal TANF money over to the administrators of another federal-state program for use in the latter program, the federal TANF funds become subject to the rules of that program.  *See Helping Families Achieve Self Sufficiency – A Guide on Funding Services for Children and Families through the TANF Program,* U.S. Department of Health & Human Services.

93.     Third, if the EIP program uses federal TANF funds to provide "assistance," *i.e.,* temporary funding to cover the costs of a family's basic needs, then the family must meet certain federal requirements relating to employment and duration of assistance.  Once any individual in the family has received assistance from federal TANF funds for five years, the entire family becomes ineligible to receive additional federal TANF assistance.  42 U.S.C. § 608.  In addition, a parent or caretaker receiving TANF assistance must engage in work by the earlier of: i) 24 months from the beginning of the assistance, and ii) the date when the state determines that he or she is ready to resume work.  45 C.F.R. § 261.10.  If the parent or caretaker is not working or is exempted from the work requirement, he or she must engage in community service activities within two months of starting on TANF assistance.  *Id.*

**False Claims for TANF Funds – Billing as Primary Payer**

94.     CSC, as fiscal agent for the State of Indiana, and at the request of state officials, has violated federal law by billing federal TANF funds as if TANF were the primary payer rather than payer of last resort.  First, CSC, in conspiracy with state officials, has billed federal TANF funding sources for early intervention services prior to determining whether a recovery from a

third-party insurer is possible. This violates the rules of federal TANF funding and the federal-state Early Intervention Program, which make federal TANF funds used for an EIP a payer of last resort. State officials have asked CSC to bill TANF without regard to whether third-party insurers might pay because of a concern that they would otherwise lose federal TANF block grant funding that would not carry over into subsequent years.

95.     Thus, on June 8, 2010, in a CSC document called *IN-Acceptance Doc – 031 TANF Claiming Modifications 20100608a.Pdf,*, Lori Miller, Director, Bureau of Child Development Services, Family and Social Services Administration, State of Indiana, signed a statement of her understanding that:

> First Steps is aware the TANF will be billed before the claims are completely 'cycled' through the fund recovery process of all submission sources. It is possible CSC will collect funds from other funding sources for the same claims submitted to/paid by TANF. The potential will exist for collecting more from all funding sources (except Medicaid (XIX) – CSC will wait for XIX remits before moving claims from XIX to TANF) than what was originally paid the provider.
>
> If a claim is billed to TANF and subsequently funds are collected from private insurance, TANF will not be reimbursed for those collections; there is no coordination of benefits with TANF once claims have been submitted to TANF.

The identity of claims billed to TANF without waiting for recovery from a third-party insurer can be determined by searching the CSC claims database for claims submitted to TANF on behalf of children with third-party insurance, and then ascertaining whether TANF paid such claims as the primary or secondary payer.

96.     Second, CSC, at the request of and in conspiracy with state officials, has illegally billed TANF funding sources without first waiting to learn whether Medicaid will pay the claim. While these actions are contrary to the representation in the document quoted in the preceding

paragraph, Relator's firm recollection and understanding is that Indiana state officials, in approximately May or June 2008, requested that CSC engage in this practice and CSC did so.

97.     There is no available procedure to refund TANF overpayments.  Accordingly, in instances in which CMS recovered from TANF as primary payer, and then also recovered funding from a third-party liability payer and/or Medicaid, the State of Indiana recovered federal TANF funds to which it was not entitled.  These funds were then available for and diverted to unauthorized uses by the State. The damages on this claim are all recoveries from federal TANF sources to which Indiana would not have been entitled had it billed only after the claims had been denied by other available funding sources.

### False Claims to TANF - Presumed Eligibility

98.     Since approximately April 2010, and again at the request of state officials who feared losing federal TANF funding that would not carry over into subsequent years, CSC has submitted claims to federal TANF sources on behalf of children whose families have not been approved for TANF assistance in accordance with federal regulations and the Indiana State Plan. State officials administering the EIP have requested that CSC simply "presume" the eligibility of any child in a family with a current income level below 250% of the federal poverty level.  This request of CSC was made in a signed request from Lori Miller, Director, Bureau of Child Development Services, on April 30, 2010, and also reflected in a document entitled IN-Accept-TANF-EligibilityDefinition-final-20100423.  Through December 7, 2011, CSC knowingly and improperly submitted at least $1.5 million in claims to federal TANF funding sources for "presumed TANF eligible" children who had not, in fact, been assessed by the state to determine whether their families met the federal criteria.

**False Claims to Medicaid – Billing as Primary Payer**

99.     Since approximately July 2009, at the request of, and in conspiracy with Indiana state officials, CSC has submitted false claims to Medicaid by billing Medicaid as if it were the primary payer.   Thus, in April 2009, in a document called "First Steps/Medicaid/Hoosier Healthwise Fund Recovery Requirements," CSC employee "Tony" recorded the following instruction from the State of Indiana's Family & Social Services Administration (FSSA):

> FSSA indicated a desire to submit claims to TPL [third-party liability] and Medicaid simultaneously for those claims (participants) with dual eligibility (these are noted to comprise a small minority of all participants). CSC noted that this is technically contrary to routine (HIPAA) procedure when submitting a claim to multiple payers, and that complexity may arise from the need to act on those rare cases where both TPL and Medicaid paid a claim. Dawn [Downer, Bureau of Child Development/FSSA] volunteered to provide the text of the agreement allowing this submission protocol, and CSC agreed to consider and document the issues arising from it.

100.     Following a July 2, 2009 meeting between CSC and Indiana officials, on July 10, 2009, CSC submitted a document to Indiana concerning the agreed-upon order of submission of claims.   In that document, which was entitled "IN Submission Flow 07-10-2009," CSC included a schematic showing provider claims being submitted to both TPL and Medicaid on the next submission following receipt of the provider's claim.   The schematic also showed any resulting overpayments by Medicaid being adjusted on future claims.

101.     However, CSC knew full well that its software had <u>not</u> been programmed to identify and refund overpayments from Medicaid.   Accordingly, if CSC's simultaneous billing resulted in duplicative payments by TPL and Medicaid, CSC's software program would not automatically report and repay the overpayments.   Through these actions, CSC, in conspiracy with the State of Indiana, violated the federal law that requires Medicaid to pay as secondary

payer and submitted false claims to Medicaid as if Medicaid were the primary payer, in an amount to be determined.

<b>Failure to Refund Credit Balances Owed Medicaid</b>

102.    Like NYC and New Jersey, Indiana has continued to carry significant credit balances on the books and records of its Early Intervention Program, and it has neither reported nor refunded these amounts to the insurers owed the funds.  This is because CSC has acceded to the requests by the State of Indiana that it bill primary and secondary insurers simultaneously for claims, yet has failed to program its billing software to report or refund any resulting overpayments from Medicaid.

103.    In 2008, Relator wrote a set of requirements for CSC's contract with Indiana that included a procedure for identifying and refunding insurer overpayments.  He submitted these business requirements to John Thompson, CSC's Project Director for Indiana, and to a CSC business analyst, Tony Taylor.  Taylor prepared a new document that constituted a more detailed version of the requirements prepared by Relator.  Taylor's document was submitted to and approved by the State of Indiana.  However, CSC's software programmers exhausted CSC's internally budgeted programming hours before they had a chance to write software code to implement the refund requirement, and when they asked Thompson for authority to spend additional time on writing logic to implement the refund requirement, he refused to approve additional hours for this work.

104.    On claims with dates of service between January 1, 2003 and November 2, 2011, Indiana's Early Intervention Program is carrying a credit balance of $766,739, with a significant amount of this credit balance attributable to overpayments by Medicaid.

105.    The following are examples of claims with credit balances owed Medicaid (M/A)

in light of an overlapping payment by a third-party with liability (TPL):

| Claim No. | D/O/S | TPL Paid | M/A Paid | Paid to Provider |
|---|---|---|---|---|
| 6020368-1 | 06/02/10 | $81 | $54.84 | $90.00 |
| 5799510-1 | 01/06/10 | $65.41 | $50.32 | $72.68 |

## DAMAGES

106.    Through the foregoing conduct, Defendants CSC and NYC knowingly have submitted false claims and knowingly and improperly have avoided obligations to repay funds to the New York State's Medicaid Program and New York State's Early Intervention Program, both of which are jointly financed by the federal government and the State of New York.  Through the foregoing conduct, Defendant CSC also knowingly has submitted false claims to, and knowingly has concealed or improperly avoided obligations to repay funds to the Medicaid programs of New Jersey and Indiana, each of which is jointly financed by the federal government and the state in question.  Finally, through the foregoing conduct, CSC has submitted false claims to the federal TANF program.  The damages from the false claims and avoidance of obligations to remit overpayments set forth herein total at least $80 million. However, Relator computed damages based on data that ended in September or November 2011 (in the case of credit balances and claims on federal TANF sources) and other data that ended in December 2011 (in the case of switched diagnosis codes).  By today's date, with the illegal practices continuing, Relator estimates that the combined damages to the federal government and the State of New York significantly exceed $80 million.

## COUNT I

(Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*)

107.    This is a civil action by Plaintiff Vincent Forcier, acting on behalf of and in the name of the United States, against the Defendants CSC and New York City under the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3730(b).

108.    Plaintiff realleges and incorporates by reference paragraphs 1 through 106 as though fully set forth herein.

109.    The Defendants knowingly have presented or have caused to be presented false or fraudulent claims for payment by the United States, in violation of 31 U.S.C. § 3729(a)(1)(A) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(1) (pre-May 2009 amendment).

110.    The Defendants knowingly have made or used, or caused to be made or used, false records or statements material to false or fraudulent claims in order to get such claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(2) (pre-May 2009 amendment).

111.    The Defendants knowingly have conspired to violate the federal False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(3) (pre-May 2009 amendment).

112.    Defendants have knowingly and improperly concealed or avoided obligations to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G) (2009).

113.    Because of the Defendants' conduct set forth in this Count, the United States has suffered actual damages in the tens of millions of dollars, with the exact amount to be determined at trial.

## <u>COUNT TWO</u>

(New York False Claims Act, NY Finance Law, Art. 13, § 187 *et seq*.)

114.    This is a civil action by Plaintiff Vincent Forcier, acting on behalf of and in the name of the State of New York, against Defendant CSC under the New York False Claims Act, NY Finance Law, Art. 13, § 187 *et seq*.

115.    Plaintiffs re-allege Paragraphs 1 through 106, inclusive.

116.    Defendant CSC knowingly has presented or caused to be presented false or fraudulent claims for payment in violation of the New York False Claims Act, NY Finance Law, Art. 13, § 189(a).

117.    Defendant CSC knowingly has made or used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of the New York False Claims Act, NY Finance Law, Art. 13, § 189(b).

118.    Defendant CSC knowingly has conspired with NYC to violate the New York False Claims Act, in violation of the New York False Claims Act, NY Finance Law, Art. 13, § 189(c).

119.    Defendant CSC knowingly has had possession, custody, or control of property or money used, or to be used, by the State of New York and knowingly has delivered, or caused to be delivered, less than all of that money or property, in violation of the New York False Claims Act, NY Finance Law, Art. 13, § 189(d).

120.    Defendant CSC knowingly has made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State of New York in violation of the New York False Claims Act, NY Finance Law, Art. 13, § 189(e).

121.    Because of the Defendant CSC's conduct set forth in this Count, the State of New York has suffered actual damages in the tens of millions of dollars, with the exact amount to be determined at trial.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff Vincent Forcier prays for the following relief:

1.    On Counts One and Two, for the United States or New York State, as applicable, against the Defendants in an amount equal to three times the damages the federal or state plaintiff government, respectively, has sustained because of the Defendants' actions, plus a civil penalty of $11,000 for each violation;

2.    On Counts One and Two, an award to the Relator of the maximum allowed under the federal or New York State law under which suit is brought by the Relator on behalf of the federal or state plaintiff, respectively;

3.    Against the Defendants, attorneys' fees, expenses and costs of suit; and

4.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.


Respectfully submitted,


*Robert L. Vogel*
_____

Shelley R. Slade
Robert L. Vogel (SDNY Bar No. RV1527)
Janet L. Goldstein
VOGEL, SLADE & GOLDSTEIN, LLP
1718 Connecticut Avenue, NW, 7th Floor
Washington, D.C. 20009
Tel.: 202-537-5900
sslade@vsg-law.com
rvogel@vsg-law.com
jgoldstein@vsg-law.com

Attorneys for Vincent Forcier

Dated:   March 9, 2012