UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA and STATE   :
OF NEW YORK ex rel. NICHOLS          :
                                     :        12-cv-1750 (JSR)
          -v-                        :
                                     :
COMPUTER SCIENCES CORPORATION and    :        OPINION & ORDER
CITY OF NEW YORK,                    :
                                     :
          Defendants.                :
------------------------------------x
JED S. RAKOFF, U.S.D.J.

    Relator Vincent Forcier[1] filed this qui tam action under
seal on March 9, 2012 on behalf of the United States of America
(the "Government") and the State of New York (the "State").
Complaint, Dkt. No. 130. Relator brought claims under, inter
alia, the False Claims Act (the "FCA") against New York City
(the "City") and its billing agent Computer Sciences
Corporation("CSC"), alleging that they carried out an $80
million fraud on the federal-state Medicaid program by
wrongfully obtaining reimbursement from that program. On July
28, 2020, after more than eight years of litigation before two
federal judges, the parties submitted and the Court approved
stipulations resolving the pending causes of action on the
merits. The City agreed to pay $925,000, while CSC agreed to pay
$1.85 million. Dkt. Nos. 191-193.

---

[1]    Forcier died in 2019 and was thereafter replaced by his
mother Oma Nichols in her capacity as personal representative of
his estate. Dkt. No. 169.

1

Now before the Court is Relator's motion, pursuant to 31 U.S.C. § 3730(d)(1), for reasonable expenses necessarily incurred and reasonable attorneys' fees and costs, against the City. Relator seeks an award against the City of $1,621,007.18 in legal fees for the services of three law firms that worked on this matter and $26,797.87 in expenses. Objecting on numerous grounds to the scale of this request, the City argues that Relator's request should either be denied in whole or else awarded in part in an amount no greater than $64,479.85 in legal fees and $4,098.72 in expenses. For the reasons set forth below, Relator's motion is granted in part and denied in part, and the Court awards Relator attorneys' fees in the amount of $317,668.77 and expenses in the amount of $21,782.87 against the City.

I.   Background

A. Statutory Background

The FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval," as well as "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). While the Attorney General is primarily responsible for investigating and suing over violations of the FCA, private parties -- known as "relators" -- are also

permitted to bring a "civil action for a violation of section 3729 on behalf of the United States Government." Id. § 3730(a), (b)(1). In that event, the Government may "elect to intervene and proceed with the action." Id. § 3730(b)(2). If it does, "it shall have the primary responsibility for prosecuting the action." Id. § 3730(c)(1)-(2)(B).

When the Government intervenes and prevails on one or more claims, the relator may "receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." Id. § 3730(d)(1). The relator "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs," for successful claims. Id.

B. Factual Background

On March 9, 2012, Vincent Forcier filed this qui tam action on behalf of the United States alleging, among other things, fraud by the City and CSC with regard to the New York Medicaid Program. Dkt. No. 130 ("Complaint").[2] The purpose of the fraud scheme was to enable the City to increase the amount and speed

---

[2]     Relator also brought claims on behalf of the State of New York against CSC. Dkt. No. 130.

of Medicaid reimbursements for Early Intervention Program

("EIP") services. EIPs, which are established by states and

cities to qualify for federal funding under the Individuals with

Disabilities Education Act, 20 U.S.C. §§ 1431-1444, provide

interventional therapy to young children who have or are likely

to develop developmental delays. Compl. ¶ 2. At all times

relevant to the lawsuit, EIP services for children in the City

were provided by service providers under contract with the City.

Id. The City would reimburse these providers and, in turn, would

itself seek reimbursement -- first, from private insurers and,

only after exhausting private insurance coverage, then from

Medicaid. Id. ¶¶ 27, 36-37. To obtain reimbursement from

Medicaid, the City would have to provide certain information

regarding, among other things, a child's diagnosis and gender,

and where the service was provided. Id. ¶¶ 33, 82-83.

    The Complaint alleged numerous fraudulent schemes (some in

more detail than others):

- The 315.9 Claim: The City, in conspiracy with CSC, used a

  made-up diagnosis code -- 315.9 -- when a service

  provider did not supply the City with a valid diagnosis

  code. Id. ¶¶ 49-71.

- The Switching Claim: The City, in conspiracy with the

  CSC, fraudulently "switched" certain codes -- such as

4

gender codes -- in order to get claims paid faster. Id.
¶¶ 81-83.

- The Refund Claim: The City, in conspiracy with CSC,
  failed to refund overpayments received from the Medicaid
  Program. Id. ¶ 78.

- The Other State Claims: CSC violated New Jersey and
  Indiana Medicaid requirements in various ways. Id. ¶¶ 84-
  105.

- The Secondary Payer Claim: The City, in conspiracy with
  CSC, "submitted claims to Medicaid when claims to third-
  party insurance were pending," in violation of the
  requirement to exhaust private insurance coverage before
  submitting claims to Medicaid. Id. ¶ 75.

Based on these allegations, Relator asserted causes of
action under 31 U.S.C. § 3729(a)(1)(A)[3] for the knowing
submission of false claims and 31 U.S.C. § 3729(a)(1)(G) for the
knowing and improper concealment or avoidance of obligations to
pay or transmit money to the Government. Compl. ¶¶ 109, 112.
Relator alleged that these fraudulent schemes generated $80
million, of which more than $70 million was traceable to the
315.9 Claim. Id. ¶¶ 1, 70. On October 27, 2014, Relator filed a

---

[3]    Relator also brought this claim under the predecessor
statutory provision at 31 U.S.C. § 729(a)(1).

First Amended complaint, which added additional allegations regarding the Switching Claim and added another $20 million in damages. Dkt. No. 15 ("FAC"), ¶¶ 1, 76-94.

Also on October 27, 2014, after a two and half-year investigation into Relator's allegations in which Relator and counsel were heavily involved, the Government intervened and filed its own complaint. Dkt. No. 13 ("U.S. Complaint").[4] The U.S. Complaint adopted Relator's 315.9 Claim. U.S. Compl ¶¶ 97-105. In addition, the Government included Relator's Switching Claim, albeit not as a separate cause of action against the City but as evidence of a "pattern of deliberate disregard for complying with the billing rules or submitting accurate information." Id. ¶¶ 117-121, 124-127. Finally, the U.S. Complaint fleshed out Relator's Secondary Payer Claim, which was only briefly mentioned in Relator's complaint, by alleging the means through which the City and CSC circumvented the requirement to exhaust private insurance coverage before submitting to Medicaid:

- The Nine 9's Claim: The City, in conspiracy with CSC, used a placeholder (999,999,999) to submit claims to private insurers knowing that the claim would be denied,

---

[4]     New York State also intervened but asserted claims only against CSC. Dkt. No. 14.

and subsequently submitted those claims to Medicaid. Id.
¶¶ 70-76.

- The 0Fill Claim: The City, in conspiracy with CSC,
  submitted Medicaid claims that contained a "0Fill"
  modifier," indicating that the claim had been rejected by
  private insurance, when, in fact, the claim was still
  pending before private insurance. Id. ¶¶ 77-86.

On December 12, 2014, Relator filed a Second Amended
Complaint ("SAC"), which "incorporate[d] by reference and
adopt[ed] the United States' Complaint-in-Intervention." Dkt.
No. 25, ¶ 1.

On January 26, 2015, the City and CSC moved to dismiss the
U.S. Complaint and the Relator's SAC. Dkt. No. 37.[5] On April 28,
2016, Judge Batts, to whom the case was then assigned, denied
the motions to dismiss the Secondary Payer Claims, granted the
motions to dismiss the 315.9 Claims and the Refund Claims, and
granted the motion to dismiss Relator's SAC as duplicative of
the U.S. Complaint. See United States ex rel. Forcier v.
Computer Science Corp., 183 F. Supp. 3d 510 (S.D.N.Y. 2016). In
doing so, Judge Batts made clear that the dismissal of Relator's

---

[5]    CSC also moved to dismiss the State complaint. Dkt. Nos.
47.

SAC "does not alter or impair Relator's continuing statutory rights" as set forth in the FCA. Id. at 529.

On September 6, 2016, the Government filed an amended complaint, adding a claim -- the Fraudulent Inducement Claim -- that CSC fraudulently induced Medicaid to approve its enrollment as a billing agent by failing to disclose an incentive fee provision in its contract with the City that enabled CSC to share in certain of the City's Medicaid profits. Dkt. No. 83 ("U.S. Amended Complaint"), ¶¶ 9, 119-126.[6] While the Government had alleged the existence of this fee provision in its original complaint, it did so only to explain how the City motivated CSC to overbill Medicaid. See U.S. Compl ¶¶ 53-60. On November 14, 2016, the City filed its answer to the U.S. Amended Complaint. Dkt. No. 97.

CSC, meanwhile, moved to dismiss the U.S. Amended Complaint. Dkt. No. 91. The City did not participate in this motion practice, because the Government's only new allegation (the Fraudulent Inducement Claim) was brought against CSC, not the Government. On August 10, 2017, Judge Batts denied CSC's motion to dismiss and allowed the Government's Fraudulent Inducement Claim to proceed. See United States ex rel. Forcier

---

[6]    The State also filed an amended complaint to include this allegation. Dkt. No. 84.

v. Computer Science Corp., No. 12-cv-1750 (DAB), 2017 WL 3616665 (S.D.N.Y. Aug. 10, 2017).

Thereafter, the parties -- but not the City -- engaged in additional motion practice and participated in unsuccessful mediation. Dkt. Nos. 117-40. In October 2018, the parties commenced discovery.

On February 19, 2020, the case was reassigned to the undersigned. On July 28, 2020, the Government submitted -- and this Court approved -- stipulations resolving the pending causes of action on the merits. Dkt. Nos. 191-193. CSC agreed to pay $1.85 million to resolve the pending Fraudulent Inducement and Secondary Payer Claims, while the City agreed to pay $925,000 to settle the Secondary Payer Claim.[7] The Government agreed to pay 22.5% of its recovery to Relator pursuant to 31 U.S.C. § 3730(d)(1).[8]

The stipulations, however, did not resolve Relator's claims for attorneys' fees and expenses. On August 7, 2020, Relator separately settled her claim against CSC for attorneys' fees and expenses for $550,000. Dkt. No. 203-1. Now before the Court is Relator's motion for attorneys' fees and costs against the City.

---

[7]   The City admitted to the facts underlying the 0fill claim, but not the Nine 9's claim. See Def. Mem. at 19 n.5.

[8]   Separately, and pursuant to state law, the State agreed to pay the same share from its recovery to Relator.

II.  Discussion

   Under the FCA, "a qui tam plaintiff who obtains a
settlement with a defendant is entitled to an award of
reasonable attorneys' fees and cost." United States ex rel.
Keshner v. Nursing Personnel Home Care, 794 F.3d 232, 237 (2d
Cir. 2015).[9] To determine what constitutes a "reasonable fee,"
courts begin by looking to the lodestar, "the product of a
reasonable hourly rate and the reasonable number of hours
required by the case." Millea v. Metro-North R. Co., 658 F.3d
154, 166 (2d Cir. 2011).

   In this case, Relator was primarily represented by the law
firm Vogel, Slade & Goldstein ("VSG"). VSG, in turn, retained
Susman Godfrey LLP in 2017 and Yankwitt LLP in 2019. All told,
over the course of eight years, Relator's counsel billed 2879.62
hours that allegedly reflects the work that they performed in
investigating, developing, litigating, and, ultimately,
resolving the successful Secondary Payer Claim, in addition to
time spent preparing this motion. Memorandum of Law in Support
of Relator's Motion for an Award of Relator's Expenses and
Attorneys' Fees and Costs Against Defendant New York City ("Rel.
Mem."), Dkt. No. 195, at 14. With hourly rates of $850 for

---

[9]    Unless otherwise indicated, in quoting cases all internal
quotation marks, alterations, emphases, footnotes, and citations
are omitted.

partners, $425-$500 for associates, and $125-$225 for paralegals, Relator's counsel seeks to recover $1,621,007.18 from the City in attorneys' fees and $26,797.87 in expenses.[10]

The City objects to this amount on several grounds: (1) that Relator's requested hourly rates are unreasonable; (2) that many of Relator's billed hours are unreasonable; (3) that Relator's fee application does not reflect the limited extent of her success in this litigation; (4) that Relator's expenses are unreasonable; and (5) that the fees and expenses should be apportioned between the City and CSC in proportion to their liability. The Court addresses each in turn.

A. Hourly Rates

A reasonable hourly rate is "what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." Bergerson v. New York State Office of Mental Health, Cent. New York Psychiatric Ctr., 652 F.3d 277, 289-90 (2d Cir. 2011). The rate must be "in line with prevailing rates in the community for similar services by lawyers of reasonably comparable skill, expertise and reputation." McDonald ex rel

---

[10]   Relator had initially requested $1,599,034.67 in attorneys' fees, but subsequently added another $22,185 of fees in connection with its reply papers and subtracted $212.50 in fees that were inadvertently included in the original application. See Reply at 9 n.11 and 10.

Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund,
450 F.3d 91, 96 (2d Cir. 2006) (per curiam). Among other things,
a court should consider the so-called Johnson factors, to help
determine "what rate a paying client would be willing to pay."
See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County
of Albany and Albany County Bd. of Elections, 522 F.3d 182, 186
(2d Cir. 2008) (citing Johnson v. Ga. Highway Express, Inc., 488
F.2d 714 (5th Cir. 1974)); see also Lilly v. City of New York,
934 F.3d 222, 239-230 (2d Cir. 2019).[11] A Court may take
"judicial notice of the rates awarded in prior cases, and
consideration of the evidence proffered by the parties." United
States ex rel. Fox Rx, Inc. v. Omnicare, Inc., No. 1-cv-275
(DLC), 2015 WL 1726474, at *2 (S.D.N.Y. Apr. 15, 2015).

As mentioned, Relator's counsel seeks fees based on the
following hourly rates: $850 for partners, $425-$500 for

---

[11]   The Johnson factors include: (1) the time and labor
required; (2) the novelty and difficulty of the questions;
(3) the level of skill required to perform the legal
service properly; (4) the preclusion of employment by the
attorney due to acceptance of the case; (5) the attorney's
customary hourly rate; (6) whether the fee is fixed or
contingent; (7) the time limitations imposed by the client
or the circumstances; (8) the amount involved in the case
and the results obtained; (9) the experience, reputation,
and ability of the attorneys; (10) the "undesirability" of
the case; (11) the nature and length of the professional
relationship with the client; and (12) awards in similar
cases. Arbor Hill, 522 F.3d at 186 & n.3 (quoting Johnson,
488 F.2d at 717-19).

associates, and $125-$225 for paralegals. Rel. Mem. at 17. To support the reasonableness of these rates, Relator points out that Judge Cote observed, five years ago, that the average partner billing rate in this District was $942 per hour. Id. (citing Fox, 2015 WL 1726474, at *2). In Fox, another FCA case, Judge Cote approved an hourly rate of $836 for partners and between $541.50 and $631.75 for associates. 2015 WL 1726474, at *3. Relator also points out that partner rates in this District are often in excess of $1,000 for complex commercial litigation (albeit not specifically for FCA cases). Rel. Mem. at 18. Turning to the Johnson factors, Relator stresses that the skill level required in an FCA case is high and that counsel have "strong reputations and excellent credentials," submitting a declaration from another attorney to that effect. Id. at 19.

The City argues that these rates are unreasonable. Def. Mem.") at 25. First, the City contends these rates are "higher than the market rates in the community for FCA litigations." Id. The City cites to United States ex rel. Wood v. Avalign Technologies, Inc., No. 14-cv-4958 (ER), 2020 WL 2555115 (S.D.N.Y. May 20, 2020), a recent FCA case where Judge Ramos approved hourly partner rates of $800, associate rates of $400, and paralegal rates of $100-$150. Relator's rates are also unreasonably high, the City suggests, in light of the nature of much of Relator's counsel's work (i.e., document review, basic

legal research, etc.) and the size of the two firms (VSG employs three attorneys and Yankwitt employs fewer than 20). Def. Mem. at 25. To remedy this, the City proposes a reduction of 25% to the requested fees.

VSG and Yankwitt are smaller firms, to be sure, but there is every indication that they are highly qualified qui tam litigators. In light of the prevailing rates in this District, the attorneys' legal experience, and the complexity of this qui tam suit, the Court finds that Relator's requested rates are reasonable, even if they are slightly higher than those recently approved of by Judge Ramos.

B. Billed Hours

"Courts in this Circuit have recognized a district court's authority to make across-the-board percentage cuts in hours, as opposed to an item-by-item approach, to arrive at the reasonable hours expended." Williams v. Epic Sec. Corp., 368 F. Supp. 3d 651, 656-57 (S.D.N.Y. 2019). This is especially so where, as here, the length of the litigation makes it impracticable to perfectly separate out the hours dedicated to unsuccessful claims. Cf. Fox v. Vice, 563 U.S. 826, 838 (2011) ("The essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection.").

Over the course of eight years, Relator's counsel billed 2879.62 hours.[12] The vast majority of hours -- 2570.82 -- were billed by VSG, of which Shelly Slade, the lead partner on the matter, billed 1030.85 hours at $850 an hour. Yankwitt billed 297.1 hours, of which Kathy Marks, the lead partner on the matter, billed 268 hours at $850 an hour. And Susman billed 11.7 hours, at $800 per hour. According to Relator, these hours reflect only "the work that counsel performed in investigating, developing, litigating, and, ultimately, resolving" the Secondary Payer Claim, in addition to time spent preparing this motion. Rel. Mem. at 14. Relator explains that she made a number of deductions to make good on this representation.

The City argues, however, that Relator is wrongfully seeking to recover for: (1) hours billed during the seal period; and (2) hours billed in connection with claims that were not successful against the City.

### i. Fees Incurred During the Seal Period

---

[12]   While Relator does not report this number outright, the Court calculated it by summing up: VSG's billable hours excluding work on the reply brief: 2553.32, Dkt. No. 197-1 at 30; Yankwitt's billable hours excluding work on the reply brief: 288.5, Dkt. No. 196, ¶ 4; Susman's total billable hours: 11.7, Dkt. No. 197-6 at 3; VSG's billable hours for work on the reply brief: 17.5, Dkt. No. 203, ¶ 3; and Yankwitt's billable hours for work on the reply brief: 8.6, Dkt. No. 202, ¶ 2.

Relator billed $694,287.25 for work done during the roughly two and half-year long "seal period" -- that is, between when Relator first brought the allegations to the Government's attention on March 9, 2012 and the Government's decision to intervene on October 27, 2014. Of that amount, Relator seeks to recover from the City $363,382.38, or just over half.

The City argues, however, that Relator should not be reimbursed for any work done during the seal period. Def. Mem. at 11-12. According to the City, "while the Relator's case remains under seal, the onus is on the Government, not Relator, to investigate and evaluate Relator's claims." Id. For support, the City cites to an out-of-circuit district court opinion, which explained that during the seal period the "relator is . . . obligated to remain idle pending resolution of the government's investigation and decision whether to intervene." United States ex rel. Sarmont v. Target Corp., No. 02-c-0815, 2003 WL 22389119, at *4 (N.D. Ill. Oct. 20, 2003). Accusing the Government of "offshoring its investigatory obligations to an outside firm," the City takes particular issue with the manner in which Relator's counsel "undertook to do the entire review of the materials CSC produced in response" to the Government's Civil Investigative Demand ("CID").[13] Def. Mem. at 14. After the

---

[13]   The Government may issue a CID when it "has reason to believe that any person may be in possession, custody, or

Government received the enormous CID materials,[14] Relator's counsel purchased software to review the data, had its attorneys receive online training to learn how to properly review these documents, and performed at least 145.6 hours of work on general "document review" of the CID materials. Id. at 13-14.

What is worse, the City contends, the FCA does not authorize the Government to share the CID materials with Relator's counsel. The FCA provides: "Any information obtained by the Attorney General or a designee of the Attorney General under this section may be shared with any qui tam relator if the Attorney General or a designee determine it is necessary as part of any false claims act investigation." 31 U.S.C. § 3733(a)(1). That provision, according to the City, authorizes CID materials to be shared with a relator, if necessary, but not relator's counsel. Def. Mem. at 14 n.4.

In short, the City argues that a relator's involvement during the seal period should be simply to provide relevant information to assist the Government's investigation; but the investigation itself -- including document review, legal

_____

control of any documentary material or information relevant to a false claims law investigation." 31 U.S.C. § 3733.

14    These materials included "10,499 documents, spanning 163,747 pages, as well as a 500 gigabyte claims database, produced as a Microsoft SQL Server Backup Database, with 2.8 billion records . . . ." Rel. Mem. at 6.

research, etc. -- must all be done by the Government. Letter
from the City to the Court dated September 21, 2020 ("City
Letter"), Dkt. No. 205, at 5.

The Court is not persuaded. As Relator and the Government
point out, the fee-shifting provisions were added to the FCA to
address what Congress identified as the "serious problem" posed
by the "lack of resources on the part of Federal enforcement
agencies." Reply Memorandum in Support of Relator's Motion for
an Award of Relator's Expenses and Attorney's Fees and Costs
Against Defendant New York City ("Reply"), Dkt. No. 201, at 2-3
(quoting S. Rep. at 7-8 reprinted in 1986 USSCAN at 5272-73);
Letter from the Government to the Court dated September 15, 2020
("Gov. Letter"), Dkt. No. 204, at 3-4. Thus, the City's reading
of the statute would run headlong into the fee shifting
provision's very purpose: to allow the "private citizenry" to
"bolster[] the Government's fraud enforcement effort." S. Rep.
at 8.

Indeed, as mentioned above, the FCA expressly permits the
Government to share CID materials with the relator "if the
Attorney General or designee determine it is necessary as part
of any [FCA] investigation." In this case, as the Government
explains, such sharing was "necessary" because the CSC's CID
productions included information that Relator, as a former
employee of CSC, and his attorneys could help the Government

18

make sense of. Gov. Letter at 3.[15] Moreover, the City's reading

of the CID provision is misguided. Because rules of professional

responsibility forbid the Government from communicating with a

represented party without going through counsel, the Court

agrees with Relator that "the more logical reading of the

statute is that Congress subsumed counsel in its reference to

relator." Reply at 4.

Moreover, as Relator and the Government point out, internal

Department of Justice guidelines for assessing the extent of a

relator's contribution specifically list whether "relator's

counsel provided substantial assistance to the Government." Gov.

Letter at 4; see also United States ex rel. Alderson v. Quorum

Health Group, Inc., 171 F. Supp. 2d 1323, 1333-34 (M.D. Fla.

2001) (listing the DOJ guidelines).[16] And other courts have

---

[15]   The City complains that "[n]o such determination of
"necessity" is reflected in any sworn declaration of counsel."
City Letter at 4. But the statute does not require the
Government to submit a sworn declaration of necessity before
sharing CID materials with relator's counsel.

[16]   The City also suggests that allowing relator's counsel to
recover fees for work incurred assisting the Government's
investigation could "result in an inappropriate double payment
not contemplated by the FCA." City Letter at 4 n.4. The City
points out that in Cook County, Illinois v. United States ex
rel. Chandler, 538 U.S. 119, 130-31 (2003), the Supreme Court
recognized that the Government's recovery in a FCA case might be
increased, among other reasons, to compensate the Government for
the cost of investigation. If both the Government and relator's
counsel are compensated for work done during the seal period,
the City suggests, that would result in double-dipping. But just
because both parties are being compensated does not mean that

awarded fees for "time spent assisting the Government with the Government's investigation." See United States ex rel. LeFan v. General Elec. Co., No. 00-cv-222, 2008 WL 152091 (W.D. Ky. Jan. 15, 2008).

Finally, the City's reliance on Target is misplaced. That case, as Relator explains, involved a situation where the defendant moved to dismiss a qui tam action for lack of diligent prosecution, where, after a decade-long investigation, the Government ultimately declined to intervene. 2003 WL 22389119, at *4. In denying defendant's motion to dismiss, the court explained that the relator should not be faulted for the Government's failure to investigate the relator's allegations in a timely manner. Id. That case, and the language quoted by the City, has nothing to do with the instant issue of whether, and the extent to which, the Government may rely on Relator's counsel to assist it in its investigation of Relator's claims.

Accordingly, the Court holds that the FCA does not impose a categorical bar on a relator recovering attorneys' fees for work done assisting the Government during the seal period.

      ii.  <u>Fees Not Attributable to the Successful Claim Against the City</u>

---

they are being <u>over</u>compensated. It is within the discretion of the district court to award appropriate recoveries to the Government and attorneys' fees to the relator.

As mentioned above, Relator suggests that she seeks
attorneys' fees only for work done in relation to the successful
Secondary Payer Claim. Rel. Mem. at 14. To make good on this,
Relator represents that she has made numerous deductions to her
billable hours. The City contends, however, that these
deductions fail to adequately exclude time spent on claims that
were not successful against the City. Def. Mem. at 19. There are
six points of disagreement over the hours for which Relator
seeks compensation.

1. Fees Attributable to the Switching Claim,
the Refund Claim, and Allegations Underlying
the Fraudulent Inducement Claim

The first is whether time spent on the Switching Claim,
the Refund Claim, and allegations underlying the Fraudulent
Inducement Claim are sufficiently related to the Secondary Payer
Claim so as to be compensable. "Where a lawsuit presents
distinctly different claims for relief that are based on
different facts and legal theories the claims should be parsed
out and attorneys' fees granted to a plaintiff only on
successful claims." Avalign, 2020 WL 2555115, at *8 (quoting
Mikes v. Strauss, 274 F.3d 687, 705 (2d Cir. 2001), abrogated on
other grounds by Univ. Health Servs., Inc. v. United States ex
rel. Escobar, 136 S. Ct. 1989 (2016)). However, where the
successful and unsuccessful claims are "inextricably intertwined
and involve a common core of facts or are based on related legal

theories," a court can award the entire fee. <u>Quaratino v.</u>
<u>Tiffany & Co.</u>, 166 F.3d 422, 425 (2d Cir. 1999).

The City argues that the successful Secondary Payer Claim
is "easily severable and legally distinct" from the other
unsuccessful claims brought by Relator. Def. Mem. at 16. The
Secondary Payer Claim, according to the City, rested on a New
York regulation that requires providers to take reasonable
measures to pursue third-party insurance before billing Medicaid
and a Department of Health policy that required providers to
obtain a denial from private insurance before submitting to
Medicaid. Def. Mem. at 20. By contrast, the Switching Claim and
the Refund Claim have "nothing to do with private insurance,
[are] not dependent upon the existence of actual or potential
third party insurance . . ., and do[] not involve requirements
to take reasonable measures to pursue such insurance." <u>Id.</u>
Therefore, according to the City, all such fees must be
excluded.

The Court disagrees. As Relator argues, the Switching Claim
and the Refund Claim were included in the Government's initial
complaint "not as separate claims of relief but as evidence of
[the City's] pattern of disregard for billing requirements and
scienter of wrongdoing." Reply at 6. Likewise, the allegations
regarding the existence of the fee provision were initially
included "to demonstrate how the City motivated CSC to ignore

Medicaid [rules] and other billing rules to maximize Medicaid collections." Rel. Mem. at 15. Accordingly, the Court holds that the Switching Claim, the Refund Claim, and allegations underlying the Fraudulent Inducement Claim "relate to" the Secondary Payer Claim, and work spent on those claims is therefore compensable.

2. Fees Attributable to the 315.9 Claim

The parties also disagree over whether Relator sufficiently excluded hours spent on the unsuccessful and legally distinct 315.9 Claim. Relator seeks to recover $568,169.51 in fees for work from the initial time entry in November 2011 until Judge Batts' decision to dismiss the 315.9 Claim in April 2016. Dkt. No. 199-9. Relator's counsel contend that they have excluded work done exclusively on the 315.9 claim and have reduced by half those time entries where work on dismissed claims was "indivisible" from work on the Secondary Payer Claim. Rel. Mem. at 14.

Considering how dominant the 315.9 Claim was in Relator's initial complaint, however, the Court agrees with the City that Relator's approach likely does not adequately reflect the actual division of time between work on the successful and unsuccessful claims during this period. Def. Mem. at 21. Moreover, excessive block billing makes it impossible to separate out the hours dedicated exclusively to the 315.9 Claim. However, the City's

proposal -- to entirely deny these fees -- is unreasonable. The
City's argument is based on the incorrect premise that "none of
the claims pursued in the initial phases of the litigation" were
successful. Def. Mem. at 22. While certainly not the focus of
Relator's initial complaint, the Secondary Payer Claim makes an
appearance and would later be fleshed out by the Government. See
Compl. ¶ 74. Accordingly, the Court imposes a 50% across-the-
board cut on the fees Relator seeks to recover for work done
during this period. This results in a residue $284,084.76.

### 3. <u>Fees Attributable to Claims Brought Against or By CSC</u>

Relator seeks to recover from the City $379,581.33 in fees
incurred from Judge Batts' decision in April 2016 until the
start of discovery in October 2018.[17] Much of the litigation
during this time -- including the introduction of the Fraudulent
Inducement Claim against CSC and the attendant motion practice
over that claim, the unsuccessful attempt at mediation, and
CSC's answer to the Government's amended complaint and the
attendant motion practice -- did not involve the City.

Relator insists that she is not seeking to recover for work
done on the Fraudulent Inducement Claim, which was brought only
against CSC, and her time records suggest that she has reduced

---

[17]    As mentioned above, Relator mistakenly included an
additional $212.50 in her initial application. Reply at 9 n.11.

by 50% those time entries that "relate[] in part to [a] claim brought uniquely against or by CSC." See, e.g., VSG Timesheet, Dkt. No. 197.1 at 17, Row 758. As a result, she is only seeking to recover 82% of her total fees incurred during this period. Dkt. No. 199-9. The City argues, however, that Relator is entitled to none of these fees because they all relate to work done in connection with claims brought against or by CSC. Def. Mem. at 23.

The Court agrees with the City that further cuts are in order, but finds, again, that entirely denying these fees would be too harsh. While Relator insists that she "has removed the overwhelming majority of the fees relating to CSC's counterclaim against the State," Reply at 8-9, Relator's block billing prevents the Court from confirming as much. Accordingly, the Court imposes an additional 50% across-the-board deduction for work incurred during this period, resulting in a remainder of $189,790.67.

4. Fees Incurred during Discovery

Relator seeks to recover $482,705.75 in fees incurred during the discovery period, from October 2018 until March 2020. The City argues, however, that Relator makes "no attempt to segregate fees that reasonably relate to work involving the City as opposed to CSC," and suggests that the fees should be reduced by at least 68%. Relator responds that she has "reduced to zero

fees for work on the fraudulent inducement theory of liability relating to the 'incentive fee claim' which was asserted only against CSC." Reply at 8.

Once again, while it is true that Relator reduces to zero those entries that expressly name the Fraudulent Inducement Claim, she fully counts all time entries that do not mention, one way or another, the substance of the work. In other words, Relator "effectively presume[s] that all fees are recoverable unless the recorded time entries make clear that recovery is precluded." Avalign, 2020 WL 2555115, at *8. As a result, Relator is seeking to recover 93% of her billable hours during this period, an unreasonable recovery considering CSC's outsized role during discovery. Accordingly, the Court imposes an additional across-the-board cut of 50% and awards $241,352.88 in fees for work during this period.[18]

    5. Fees Incurred During Settlement Negotiations and Relator's Fee Application

---

[18]    The City also argues that Relator should not be permitted to recover fees for work done during discovery between the death of Forcier on April 12, 2019 and the court appointment of a substitute relator on October 23, 2019 because, it argues, VSG "acknowledged that Relator's counsel would not participate in litigation during that period." Memorandum of Law of Defendant the City of New York in Opposition to Relator's Motion for an Award of Relator's Expenses and Attorneys' Fees and Costs ("Def. Mem."), Dkt. No. 200, at 24. However, as Relator responds, the action was not stayed and discovery was ongoing. Reply at 9. Moreover, VSG made no such acknowledgement; the cited email states only that counsel would not participate in one particular "meet and confer session." Id. at 9 n.12.

Relator seeks $190,550.59 in fees incurred during
settlement negotiations and in connection with this fee
application. The City argues, however, that these fees are
excessive and should be "substantially adjusted" to reflect,
among other things, the separate litigation involving CSC. Def.
Mem. at 24.

While Relator seems to have tried not to bill work relating
to the CSC settlement, see, e.g., VSG Timesheet, Dkt. No. 197.1
at 28, Row 1301, the City identifies numerous time entries that
appear related exclusively to the CSC settlement. Def. Mem. at
5. To remedy this, and the generally excessive amount of time
spent on settlement negotiations, the Court imposes a 20%
across-the-board cut and awards $152,440.47 in fees for work
during this period.

### 6. Block Billing

The City argues that a further deduction of 10% is
necessary to account for block billing, vague, irrelevant,
and/or redacted entries. Def. Mem. at 5. But the across-the-
board deductions made above already account for block billing.
The Court therefore declines this request. See Lilly, 934 F.3d
at 231 ("Factors that are already subsumed in the lodestar
calculation cannot be used to enhance or cut the lodestar
amount.").

### C. Reflecting Actual Success

The foregoing analysis puts the lodestar at $867,668.77. Where "a plaintiff has achieved only partial or limited success, the [lodestar] may be an excessive amount . . . even where plaintiff's claims were interrelated." Hensley v. Eckerhart, 461 U.S. 424, 436 (1983). Indeed, in ruling on a fee challenge, the Court must be "mindful of the Supreme Court's observation that 'the most critical factor' in a district court's determination of what constitutes reasonable attorney's fees in a given case is the degree of success obtained by the plaintiff. Barfield v. New York City Health and Hospitals Corp., 537 F.3d 132, 152 (2d Cir. 2008). The Court's assessment of "degree of success" must not be "limited to inquiring whether a plaintiff prevailed on individual claims," but must account for both "the quantity and quality of relief obtained, as compared to what the plaintiff sought to achieve as evidenced in her complaint." Id.

The City suggests that an award in this amount would not reflect "the success of relator's claims" and must therefore be reduced. Def. Mem. at 24. Specifically, the City argues that the City's payment of $925,000 to settle the Secondary Payer Claim "represents a small fraction of the damages sought in the case, which included over $100 million" in damages for mostly unsuccessful claims. Def. Mem. at 1-2.

It is true that Relator initially sought many millions in damages and recovered only $925,000 from the City. But the

settlement was still substantial and, in any event, "the
presumptively correct 'lodestar' figure should not be reduced
simply because a plaintiff recovered a low damage award."
Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 60 (2d Cir.
2012). Here, the recovery -- while smaller than what was
initially sought -- was no doubt a substantial victory. In
addition, as Relator contends, beyond her monetary recovery, her
qui tam action also led to two court opinions that clarified the
law on Medicaid billing and led to factual admissions from both
the City and CSC concerning their wrongdoing. Rel. Mem. at 2-3.
Accordingly, the Court finds that the adjusted lodestar
adequately reflects Relator's actual success in this case.

D. Expenses

Relator also seeks to recover $26,797.87 in expenses. Dkt.
No. 197-2. Under the FCA, Relator has a right to recover
expenses "necessarily incurred." Here, the City takes issue
with: (1) Relator's counsel's Concordance subscription (for
which they spent $13,585.44) and the mediation fee (for which
they spent $5,015). Def. Mem. at 5.

The Court agrees that the mediator fee is not fairly
attributable to the City, considering the City did not
participate in the mediation. Relator argues that the mediation
nonetheless benefited the City and was in service of resolving
the Secondary Payer Claim. Def. Mem. at 9. But Relator provides

no evidence in her fee application to support that claim. As for the Concordance subscription, the Court finds that it is a necessarily incurred expense, given that, as discussed above, the Government determined that it was necessary to have Relator's help to review the CID documents. Accordingly, the Court finds that Relator necessarily incurred expenses in the amount of $21,782.87.

E. <u>Apportioning Fees and Expenses Between the City and CSC</u>

Finally, the Court must determine whether, and how, to divvy up the attorneys' fees and expenses as between CSC and the City. The City asks that the Court allocate fee liability to each defendant in proportion to the percentage liability that the Government attributed to each defendant. That would mean, the City suggests, allocating at most 50% of the fees to the City. Relator, however, asks that the Court hold the City and CSC jointly and severally liable for attorneys' fees because the claims involved a "single indivisible injury." Rel. Mem. at 13 (quoting <u>Sinkov v. Americor, Inc.</u>, 419 F. Appx 86, 93-94 (2d Cir. 2011)).

"The allocation of fee liability is a matter committed to the district court's discretion." <u>Koster v. Perales</u>, 903 F.2d 131, 139 (2d Cir. 1990) <u>abrogated on other grounds by</u> <u>Buckhannon</u> <u>Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human</u>

Res., 532 U.S. 598 (2001). While "apportionment may in some cases be a more equitable resolution," a court "may hold the responsible parties jointly and severally liable for the fee award," so long as the court makes "every effort to achieve the most fair and sensible solution that is possible." Id.

The Court holds the City and CSC jointly and severally liable for the fee award. In light of the foregoing adjustments, the award appropriately reflects those fees recoverable in relation to the successful Secondary Payer Claim -- a claim that was brought against both CSC and the City. While the City suggests that CSC is twice as liable as the City because it settled for twice as much, see Def. Mem. at 5, that is not necessarily the case. The settlement with CSC was for two pending claims, whereas the settlement with the City was only for the Secondary Payer Claim. Assuming that CSC's settlement with the Government is equally apportioned between the Secondary Payer Claim and the Fraudulent Inducement Claim, then, the two defendants settled for the same amount -- $925,000 -- with respect to the Secondary Payer Claim.

However, as mentioned above, Relator has already recovered $550,000 from CSC for fees and expenses. Rel. Mem. at 14. Thus, as Relator concedes, the City remains liable only for those fees and expenses "that have not been recovered from CSC." Id.

In her reply brief, Relator suggests that her fee settlement with CSC was not apportioned between fees relating to the Secondary Payer Claim and fees relating to the Fraudulent Inducement Claim. Reply at 9-10. She argues, therefore, that "any setoff based on the settlement from CSC should be reduced by the portion of the $550,000 that the Court concludes fairly may be attributable to work dedicated exclusively to the [Fraudulent Inducement Claim]." Id. at 10. For two reasons, the Court declines to make any such setoff. First, Relator "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437. Because Relator has given the Court no details regarding her settlement with CSC, she has not met that burden here. Second, Relator's initial fee request -- for roughly $1.6 million -- did not disclose the amount of her settlement with CSC and did not incorporate the settlement into her fee request. Relator suggests she was not seeking to "double recover" because she clarified that the City should be liable for fees and expenses only "to the extent they have not been recovered from CSC." Rel. Mem. at 14. Nonetheless, it was misleading for Relator to request $1.6 million dollars in fees when she had already recovered nearly a third of that from CSC.

Therefore, the Court will offset the lodestar of $867,668.77 by $550,000 to prevent Relator from double

recovering. In sum, then, the Court awards Relator $317,668.77 in attorneys' fees and $21,782.87 in expenses.

The Clerk of the Court is directed to close the entry at docket number 194 and to close the case.

SO ORDERED.

Dated:     New York, NY
           November 9, 2020

           JED S. RAKOFF, U.S.D.J.